Milton J. BAUMEL, Plaintiff,

v.

Leonard ROSEN and Julius J. Rosen and Rosen Investment Corporation, Defendants.

Earl R. WEINER and Anita L. Weiner, Plaintiffs,

v.

ROSEN INVESTMENT CORPORATION, Leonard Rosen and Julius J. Rosen, Defendants.

Civ. A. Nos. 14013, 14014.

United States District Court
D. Maryland.

Feb. 29, 1968.

As Modified May 3, 1968.

130

Robert D. Klages, Morton E. Yohalem, H. Don Cummings, Washington, D. C., Zelig Robinson, Baltimore, Md., for plaintiffs.

Walter C. Mylander, Jr., and Charles C. W. Atwater, Baltimore, Md., for defendants.

WINTER, Circuit Judge (by designation):

Milton J. Baumel ("Baumel"), plaintiff in Civil Action No. 14013, and Earl R. Weiner and Anita L. Weiner ("Weiner"), plaintiffs in Civil Action No. 14014, sued Rosen Investment Corporation, Leonard Rosen and Julius J. Rosen seeking rescission of sales of stock of Gulf Guaranty Land and Title Company (now known as Gulf American Land Company, and hereafter referred to as "Gulf American") and/or damages. Jurisdiction is asserted under § 27 of the Securities Exchange Act of 1934. 15 U.S. C.A. § 78aa. Each complaint consists of two counts, the first alleging activities of the defendants which, it is claimed, constituted a violation of Rule 10b–5 of the General Rules and Regulations, Securities Exchange Act of 1934, 17 C.F.R. § 240.10b–5, and the second, common law fraud, which, because diversity of citizenship does not exist between the parties, is advanced under the pendent jurisdiction of the Court. The cases were consolidated for trial, non-jury. Since plaintiffs concede that the proof necessary to sustain the alleged cause of action under the first count would be only a part of the proof necessary to sustain the alleged cause of action under the second count, only the first count need be considered. If plaintiffs are entitled to recover on the first count, the measure of their recovery would be unaffected by whether they are also entitled to recover on the second count; and if plaintiffs have failed to prove such manipulative and deceptive devices as constitute a violation of Rule 10b–5,

it follows that they have failed to prove common law fraud under the law of Maryland, the place where the sales were negotiated and consummated.

## FACTS

Gulf American was incorporated under the laws of the State of Florida in July, 1957, to engage in the business of subdividing and selling real estate on installment contracts, and related businesses, in Florida and elsewhere. It has been engaged in that business from that date to the present.

Shortly after Gulf American was incorporated, Julius J. Rosen and Leonard Rosen each purchased 13,000 shares of its capital stock, of a par value of $2.00, for the sum of $26,000. This purchase represented 52% of Gulf American's stock originally authorized to be issued. Each also lent to Gulf American the principal sum of $25,000, taking five-year 6% notes as evidence of the loans. At a meeting of Gulf American's board of directors on August 23, the board granted options to a number of close business associates, relatives and friends of Julius and Leonard Rosen, including their accountant, George London, and their friend, Harold Stein, to purchase stock at its par value without the necessity of making a loan to Gulf American. At the same time, Gulf American's officers were authorized to sell additional shares of capital stock at its par value, on condition that the purchasers make loans to Gulf American, to be evidenced by promissory notes bearing interest at the rate of 10%.

Thereafter, on behalf of Gulf American, Julius and Leonard Rosen undertook a program of selling "units" of Gulf American's securities, a "unit" consisting of a $10,000 promissory note and 500 shares of capital stock, at and for a total purchase price of $11,000. To this end, Julius and Leonard Rosen enlisted the services of some of their close business associates and friends, including Harold Stein.

Because of their prominence in the business and political community and their wide acquaintanceships in the business and social community, Nathan S. Jacobson and Irvin Kovens were selected to assist in this sales effort. Also selected was Samuel J. Holtzman. By contract, dated October 30, 1957, Kovens and Jacobson agreed to sell 20 units of Gulf American securities, in consideration of which Gulf American agreed to issue them 3,000 shares of its Class A common stock.[1] Kovens and Jacobson sold in the aggregate seven and one-half units of Gulf American securities to Jerome Klaff, Milton B. Plant, Arnold L. Plant, Marvin S. Plant, Harold Effron and Irving Davison (hereafter called the "Klaff Group"). Harold Stein sold a unit of Gulf American securities to the plaintiff, Milton Baumel, in November, 1957. Leonard Rosen sold a unit of Gulf American stock to the plaintiff, Dr. Earl R. Weiner,[2] in November, 1957. Together with Samuel Holtzman, Leonard Rosen sold another unit of Gulf American securities to Sidney Poland.

Leonard and Julius Rosen were not only the principal promoters of Gulf

1. Between the date of incorporation and October 30, 1957, Gulf American's charter was amended to create two classes of common stock. Both Class A and Class B common stock were identical in regard to voting rights, participation upon dissolution, etc., except that there was a restriction on the payment of dividends to holders of Class B common stock until the holders of Class A common stock had been paid total dividends of $40 per share. Leonard and Julius Rosen exchanged the capital stock which they had previously purchased for Class B common stock. Class A common stock was sold to others.

2. Although Mrs. Weiner is a plaintiff in Civil Action No. 14014 and was a joint owner of the unit of securities purchased by Dr. Weiner, the parties have stipulated that Mrs. Weiner had no knowledge of any transaction in the case or of the operations of Gulf American. It was further stipulated that throughout the entire period she was represented by her husband and relied on him for the transactions in which she participated.

American but, at all times since the formation of that company, had been its principal officers—president and/or vice president and chairman of the board—directors and, individually and through Rosen Investment Corporation, majority stockholders. They have been engaged on a day-to-day basis in the management of the affairs of Gulf American. At the time that Gulf American was organized, Leonard and Julius Rosen occupied a similar position with Charles Antell & Co., a manufacturer of cosmetic preparations, but, in December of 1958, the assets of that company were sold to an outside purchaser for $100,000 cash, plus the value of inventory and $750,000 in notes payable in equal monthly installments, the first of which was due March 1, 1959. Thereafter, the name of Charles Antell & Co. was changed to "Rosen Investment Corporation," the corporate defendant in the consolidated cases, and Leonard and Julius Rosen continued as the sole stockholders in equal shares.

In October, 1957, when the sale of securities of Gulf American began, a document entitled "Proposal," was prepared, which set forth the organization and financing of the projected land sales of Gulf American which were proposed to be undertaken. A copy of the "Proposal" was furnished to each person who became a stockholder of Gulf American, including the plaintiffs. Included in the statements contained therein was a projection of land sales from 1958 to 1961 in the aggregate amount of $12,-000,000 which, together with home sales from 1958 to 1963 in the aggregate amount of $3,965,000, and after expenses and estimated taxes, would result in a net profit after taxes of $5,321,500. Specifically, land sales for 1958 were estimated to be $2,000,000; for 1959, $3,000,000; for 1960, $4,000,000; and for 1961, $3,000,000.

As disclosed by a prospectus, dated March 8, 1961, which was prepared when Gulf American made a public offering of additional securities, the results of operations far exceeded the original expectations as embodied in the "Proposal." Gulf American operates on a fiscal year ended August 31. For the fiscal year ended August 31, 1958, lot sales, net of cancellations, and house sales, amounted to $6,604,565. For the fiscal year ended August 31, 1959, net lot sales, house sales and motel, restaurant and other operating income amounted to $14,130,594, and the comparable figure for the fiscal year ended August 31, 1960 was $26,512,365.

An issue in the case is the proper method of accounting to determine the income from the sale of lots sold under installment contracts. The dispute revolves around whether the gross selling price of a lot should be treated as income in the fiscal period in which the contract of sale of the lot is executed (the "accrual" method of accounting), or whether there should be included in income only the installment payments made under such a contract, with an appropriate entry treating payments yet to be made as a species of deferred income (the "installment" method of accounting).

It suffices to say that, even under the method of accounting not objected to by the Securities and Exchange Commission which was employed in the prospectus, Gulf American showed consolidated net income after provision for taxes for the fiscal year ended August 31, 1958 in the amount of $404,605, for the fiscal year ended August 31, 1959, $1,446,986, and for the fiscal year ended August 31, 1960, $3,260,933.

The results of operations, including Gulf American sales, cancellations and collections, were known on a day-to-day basis to Leonard and Julius Rosen. Both were actual and self-acknowledged experts in making installment sales, and both had full appreciation of the fact, implicit in such business, that the greater the volume of sales the greater the need for additional capital to purchase land, to make improvements thereon, and to pay expenses in connection with such sales until such time as the total purchase prices under the installment con-

tracts of sale were paid in full. Leonard Rosen also fully understood the difference between installment and accrual methods of accounting for a business of the type in which Gulf American was engaged. Conversely, Milton J. Baumel, who had experience only as a prize fighter and the operator of a restaurant, and Earl R. Weiner, who is a dentist, lacked this sophisticated business knowledge. In the operation of his restaurant, Baumel relies on Mrs. Baumel and an outside accountant to keep his books and records.

Very shortly after Leonard and Julius Rosen contracted to sell the assets of Charles Antell & Co. and before the first of the notes given in partial payment for such sale matured, Leonard and Julius Rosen embarked on a plan to acquire additional stock of Gulf American. Because of the ultimate conclusion of the Court that both devised an overall scheme to acquire for themselves and Rosen Investment Corporation, which they owned, as much of the stock of Gulf American which had been issued and sold to persons other than the families and close business associates of Julius and Leonard Rosen as possible, and, because of the probative value of the evidence of the techniques employed in acquiring stock from persons other than the plaintiffs on the issues of credibility in regard to how the plaintiffs' stock was obtained, it is necessary to recite the various acquisitions in some detail.[3]

In February, 1959, with full knowledge on a day-to-day basis of the financial success which Gulf American was enjoying, as previously summarized, Leonard Rosen communicated with Jacobson and Kovens[4] and represented to them that Gulf American was in bad financial condition, that it needed money, and that unless such money were obtained Gulf American would not have sufficient capital to continue operations and, as a result, Gulf American would most likely go bankrupt, with the effect that Jacobson and Kovens and their friends to whom Jacobson and Kovens had sold shares in Gulf American would lose their investment. Leonard Rosen represented to Jacobson and Kovens that he could obtain a loan for Gulf American from a third party in Florida in the amount of $300,000–$400,000 if Rosen could, at the same time, deliver 10% of the equity capital of Gulf American to the prospective lender. Rosen stated that if Jacobson and Kovens sold seven of their "units" to him Rosen could obtain a unit each from his attorney, accountant and a member of his family in order to make up the "ten" units necessary to consummate the loan and save the company. Over a period of thirty days, Leonard Rosen communicated with Jacobson seeking the purchase of the Kovens and Jacobson stock on ten to fifteen different occasions. Finally, by contract dated March 31, 1959, Kovens and Jacobson agreed to sell 3,500 shares of Gulf American's Class A common stock to Leonard Rosen for the sum of $50,000.

Within a matter of hours of the time that the contract was executed, Leonard Rosen communicated with Jerome Klaff and advised him that he had just purchased the Kovens-Jacobson stock, and that he would purchase stock of the 7½ units of securities owned by the "Klaff Group" for $50,000. Leonard Rosen represented that he was borrow-

---

3. Defendants' objections to the receipt and consideration of evidence of other transactions are overruled. Leonard Rosen's version of the Baumel purchase was in sharp conflict with the version testified to by Baumel. The extent of a similar conflict with other witnesses in regard to similar transactions, contemporaneous in time, in a non-jury trial, is a significant factor in judging the Rosens' general credibility. Moreover, such evidence is clearly admissible to prove intent and design, II Wigmore, Evidence (1940 Ed.) §§ 302–304, 341, 371; cf., McCormick, Evidence (1954 Ed.) § 157; Swann v. United States, 195 F.2d 689 (4 Cir. 1952).

4. Jacobson and Kovens were directors of Gulf American but the Court concludes that they did not have the day-to-day knowledge of its operations possessed by Leonard Rosen.

ing money from people in New York who insisted on having an equity interest in Gulf American, and that the loan was essential in order for Gulf American to continue its operations. Ultimately the Klaff Group sold its stock to Rosen Investment Corporation, under a contract dated June 10, 1959, for $75,000. On the day after Rosen had called him, Jerome Klaff advised Jacobson and Kovens of his conversation with Rosen, and took Kovens and Jacobson to task for having sold their securities without prior consultation with him. Kovens, upon receiving the news and noticing particularly that the representations made to Jerome Klaff were different from the representations made to him, conferred with Jacobson, and Kovens and Jacobson immediately sought to rescind their sale and demanded the return of their securities. Negotiations next ensued between Leonard Rosen on the one side, and Kovens and Jacobson on the other, in respect to the latter's demand. Rosen offered, *inter alia*, to cease his purchases of stock so that Kovens and Jacobson could purchase the stock of other Class A stockholders of Gulf American or, alternatively, to resell 4 of the 7 units to Kovens and Jacobson for $100,000, stating that they were worth approximately $200,000, Rosen having purchased these units at slightly more than $7,000 per unit. The negotiations failed, and Kovens and Jacobson sued Leonard Rosen on February 1, 1960. The suit was ultimately settled.

In May, of 1959, when Sidney Poland by chance met Leonard Rosen in a hospital in Miami, Florida, where Poland's brother-in-law was critically ill, a discussion concerning Gulf American's affairs ensued. Leonard Rosen, otherwise an ebullient, optimistic person, represented that the affairs of Gulf American were going badly, and that Gulf American was in need of cash. Leonard Rosen represented to Poland that Rosen had a prospective investor in Chicago who would lend Gulf American $50,000, if he could obtain an equity interest in Gulf American. Leonard Rosen said

that if Poland wished to sell his stock, Poland might be able to realize a couple of thousand dollars profit, and that the way Gulf American's affairs were going "it would be a good thing for Poland to sell." Poland advised Leonard Rosen that he would give him his decision within a few days.

Poland then returned to Baltimore and telephoned Samuel J. Holtzman, who, with Leonard Rosen, had persuaded Poland to buy the securities initially, and sought Holtzman's advice as to whether Poland should sell his securities. Holtzman was never a stockholder of Gulf American, but was a friend of Leonard Rosen. Leonard Rosen had spoken to Holtzman prior to Poland's telephone call and told Holtzman that Gulf American needed money and was having difficulty in getting land released to make sales to outside purchasers. Rosen was optimistic about sales but pessimistic about other aspects of the business. On the basis of the information which Holtzman had received from Rosen, Holtzman advised Poland to sell. Poland sold his unit to Rosen Investment Corporation, under an agreement dated June 1, 1959, for $13,000. A month or two later Poland learned that he was paid less than others who had sold their securities. Poland confronted Leonard Rosen with this information and, as a result, Rosen Investment Corporation agreed to pay an additional sum of $7,000. Rosen also acquired stock from other sources. For Rosen Investment Corporation he purchased 500 shares of Gulf American's Class A common stock from the R. A. M. Syndicate, consisting of Robert Stofberg, Alvin Behrend and Merrill Bank, for $10,000, and he apparently sought to obtain the stock of Joseph Harmon, but was unsuccessful as to the latter.

Against this background, the specific acquisitions from the plaintiffs will be considered. First, consideration should be given to the extent of knowledge which the plaintiffs had of Gulf American's operations. Plaintiffs' business knowledge, or lack thereof, implicit from the business and profession in which

each had theretofore been engaged, has been stated. The plaintiffs were furnished with a copy of the "Proposal" which set forth the anticipated results of Gulf American's operations. Additionally, a stockholders meeting was held March 31, 1958, the minutes of which recite that the plaintiffs were present. At the meeting it was announced that Gulf American had sold over $1,000,000 worth of lots by March 26, 1958, and that the level of sales should attain a minimum of $3,000,000 worth of sales by August 30, 1958.

A second stockholders meeting was held December 17, 1958, at which Leonard Rosen stated that Gulf American "had projected sales" in the amount of $8,000,000 during the year 1959. George London, an accountant, who had been associated with Rosen enterprises for many years, made a financial report on operations for the fiscal year ended August 31, 1958 and stated that a copy of the financial report containing a balance sheet and profit and loss statement would be mailed out within several days. Milton J. Baumel was present at this meeting; the record does not disclose whether Dr. Weiner was also present. The report which was mailed contained a balance sheet as of August 31, 1958 showing an impairment in the stockholders' investment of $1,496.42 as a result of a net loss in like amount from operations for the year ended August 31, 1958. The statement of profit and loss employed the installment method of accounting and, while it showed net sales of lots in the amount of $6,368,597.42 with gross profit thereon of $3,519,-725.30, the last-named figure was reduced by unrealized gross profit on installment sales amounting to $2,661,248.98, thus leaving a gross profit realized on lots sold of $858,476.32. While the minutes of the December 17, 1958 stockholders meeting do not corroborate the fact, there was testimony that, at that meeting, George London explained the difference between installment and accrual accounting. The report, prepared by Bogue and Taylor, certified public ac-

countants, of Fort Myers, Florida, contained no such explanation, although it did state that Gulf American had elected for accounting purposes and for federal income tax reporting to take into income each year "only that portion of gross profit on installment sales that the ratio of gross profit bears to the cash received," and that this method of reporting was "consistent with accepted accounting practices within the industry as well as for federal income tax purposes."

In connection with the semi-annual payment of interest on debentures, debenture holders were advised by letter dated January 2, 1959 that Gulf American had "gone over the $9 million sales figure in spite of the fact that business has been very slow during the last sixty days of the year." A similar letter, dated July 10, 1959, succinctly stated, "Business and progress continue satisfactorily."

On or about August 24, 1959, Leonard Rosen telephoned Baumel to arrange a meeting with him. When they met, Rosen told Baumel that Gulf American was badly in need of financing and that he (Rosen) needed Baumel's stock and other stock that Rosen had or was going to get to make a substantial loan to keep Gulf American going. Rosen did not disclose, nor did Baumel ask, the person or source from which the loan could be made. While Baumel had received the Bogue and Taylor report of August 31, 1958, he was impressed only by the net loss figure of $1,496.42. Baumel did not actually know that sales were consistently running ahead of projections. He was impressed by Rosen's statement that Gulf American needed money and could get money only with Baumel's stock and the stock of others, so that Baumel concluded " * * * I thought if I wouldn't do it, I was going to lose my investment so that the best thing to do would be to sell it to him." Notwithstanding this belief, Baumel traded the price for his stock from $8,000 up to $10,000, and, on the day of settlement, further negotiated the sale of his deben-

ture at par. Baumel was aware prior to the communication from Rosen that others had sold their stock in Gulf American and Baumel had rebuffed a suggestion from Harold Stein in June, 1959, that Baumel sell his stock at that time.

Dr. Weiner sold his stock under the following circumstances: From February to August, 1959, Dr. Weiner heard a number of rumors concerning Gulf American and its affairs, principally from Albert Fleishman, who had received advice concerning the status and financial affairs of Gulf American from Holtzman, who, in turn, received such information from Leonard Rosen. The rumors were to the effect that Jacobson and Klaff had sold their stock back to Gulf American, that Gulf American was in desperate need of money, and that shares of Gulf American stock were required to induce a Philadelphia corporation to aid in the financing of Gulf American. Alarmed by these rumors, Dr. Weiner attempted to communicate with Leonard Rosen during the early part of August, 1959, but without success. Dr. Weiner next turned to Bernard H. Herzfeld, Esq., whom he knew only as counsel for Gulf American, for an explanation or confirmation of the rumors which he had heard. Dr. Weiner stated the rumors to Herzfeld, who questioned Weiner about them. Weiner disclosed that he understood that former principal stockholders had resold their securities to Gulf American at $21,000 per unit. Herzfeld confirmed the rumor that other stockholders had sold and advised Dr. Weiner that if he needed the money he should sell, that the price quoted by Weiner as the figure at which other stockholders had sold was "rather high" and that he (Herzfeld) did not think "there was any more money available for the purchase of the stock * * as a unit, a complete unit." Indeed, Weiner testified he (Herzfeld) "led me to believe * * * if I would receive

the $21,000 for the unit, that I would be very lucky to get out, that most of the money—or the money was already used up and there was no more available for that purpose." In any event, Herzfeld agreed to communicate with Leonard Rosen and, thereafter, to communicate with Weiner.

In fact, the unit of securities registered in the names of Weiner and his wife was owned 25% by Alfred Fleischman and 25% by Morton Shaw,[5] these fractional or equitable interests having been sold by Weiner after he acquired the "unit" of Gulf American's securities. Weiner advised Fleishman and Shaw of his conversation with Herzfeld and they agreed that if Weiner could obtain the price paid others all should sell.

Shortly thereafter, and after he had communicated with Leonard Rosen, Herzfeld prepared, and had executed, an agreement between Weiner and his wife and Rosen Investment Corporation, whereby the latter purchased the stock for $10,000 and the debenture at par. Weiner had no knowledge of the identity of Rosen Investment Corporation. Herzfeld did not acquaint Weiner with any facts concerning the affairs of Gulf American, and Leonard Rosen did not instruct Herzfeld to submit any facts concerning the financial status of Gulf American to Weiner.

By the acquisitions of stock from the plaintiffs and others which have been recited, as well as other acquisitions not described, the defendants collectively increased their total holdings of common stock of Gulf American from 52% to 79.6% within the period from Gulf American's first sale of stock until the first public offering of Gulf American stock on March 8, 1961. Leonard Rosen and Julius Rosen have always been equal partners in business enterprises in which they were associated, and Leonard Rosen acted on behalf of his brother in effecting purchases of Gulf American's stock. Pri-

---

5. For reasons later developed in the text, the Court finds as a fact that Leonard Rosen knew at least after June 30, 1958 that Alfred Fleishman had an interest in the stock registered in the names of Dr. and Mrs. Weiner.

or to making purchases of Gulf American stock, Leonard Rosen consulted with Julius Rosen, his brother, Bernard Herzfeld, his attorney, and George London, his accountant.

Because of the claim that Rule 10b–5 was violated by the failure to disclose certain other events concerning Gulf American which occurred prior to the acquisition of plaintiffs' stock, it is necessary to state these events. There is no question on this record that plaintiffs neither knew nor were advised of them, although they were well known to Leonard and Julius Rosen and to Bernard Herzfeld. Plaintiffs have testified that knowledge of any one of these facts would have had a material bearing on their decision to sell.

Gulf American sales had increased from approximately $6,000,000 for the fiscal year ended August 31, 1958 to $14,000,000 for the fiscal year ended August 31, 1959. Leonard Rosen paid strict attention to the volume of sales on a day-to-day basis, as well as cancellations and collections, and this information was communicated to his brother and his close financial advisers.

Early in 1959, Leonard Rosen commenced negotiations with Meadow Brook National Bank of Nassau County, Long Island, for a loan to Gulf American. The loan, in the amount of $600,000, was forthcoming on June 3, 1959. It was the first large outside financing that Gulf American had obtained and Leonard Rosen viewed the loan as "substantial" and "important," not only as advancing Gulf American's business but as a mark of lender confidence in Gulf American. In connection with negotiating the loan, Leonard Rosen obtained a statement of accounts for Gulf American as of March 31, 1959, prepared by London and Selenkow, a firm of which George London was a partner, *employing the accrual basis of accounting*, which showed an estimated profit for the seven months of operations ended March 31, 1959, after taxes, of $1,539,174—*an estimated profit of $15,000 per unit of stock outstanding*.

The statement compared the results of operations under the installment method of accounting also, but made the significant statement " * * * this method [installment method of accounting] in the early and formative stages of a business does not truly reflect the results of the activities. * * * This is entirely proper for Income Tax reporting, but management desires to show the activities of the company as reflected on the Accrual basis, setting up certain reserves for future Administration and Collection Costs."

As originally represented in the "Proposal" Gulf American had acquired 280 acres of land and had an option for an additional 1,500 adjacent acres. Prior to the acquisition of plaintiffs' stock, Gulf American had substantially increased its inventory of salable acreage.

At sometime in the period August 12 to August 25, 1959, Leonard Rosen met with representatives of Shields & Co. for the purpose of inducing Shields to effect a public offering of Gulf American securities. Leonard Rosen made disclosure to Shields & Co. of financial information concerning Gulf American, including sales, cancellations and profits, and Shields & Co. expressed interest in arranging for public or private financing, but made no commitment in that regard. Shields & Co. tentatively valued the equity of Gulf American at more than $5,000,000.[6]

On June 30, 1959, after the loan by Meadow Brook National Bank to Gulf American, Julius and Leonard Rosen and members of their family, Bernard Herzfeld, George London and others, exercised the options to purchase Gulf American stock which had been granted to them at the meeting of Gulf American's board of directors on August 23, 1957.

In 1959, Rosen Investment Corporation lent to Gulf American an aggregate sum

6. If this estimate is accepted a "unit" of stock (500 shares) would have a value of approximately $50,000.

in excess of $300,000, secured by accounts receivable of Gulf American.

## LEGAL PRINCIPLES

The first count of each complaint is grounded on Rule 10b–5, the text of which is set forth in the margin.[7] Numerous authorities have discussed the quantum of proof to sustain a cause of action under Rule 10b–5 and how a cause of action under Rule 10b–5 differs from a cause of action for common law fraud. Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del.), aff'd., 235 F.2d 369 (3 Cir. 1956), is one of the leading authorities on the subject, and S. E. C. v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y. 1966) (appeal pending, 2 Cir.), one of the latest. In the view of the United States Court of Appeals for the Second Circuit, as expressed in Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2 Cir. 1951), proof of common law fraud is required to sustain a cause of action under § 10b of the Act and Rule 10b–5, while, in the view of the United States Court of Appeals for the Ninth Circuit, as expressed in Ellis v. Carter, 291 F.2d 270 (9 Cir. 1961), and Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9 Cir. 1962), an argument to that effect was largely rejected. See also, Stevens v. Vowell, 343 F.2d 374 (10 Cir. 1965); S. E. C. v. Texas Gulf Sulphur Co., supra. Other courts have seemed to adopt a middle ground. Kohler v. Kohler Co., 208 F. Supp. 808 (D.C.Wis.1962), aff'd., 319 F.2d 634 (7 Cir. 1963); Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D. Pa.1947). See also, 3 Loss, Securities Regulation (1961 Ed.), pp. 1430, et seq. No case has come to my attention in which the United States Court of Appeals for this Circuit has spoken on the question.

■■ Rule 10b–5 is not by its terms limited to "insiders." It has special significance for an insider, however, because it imposes a more stringent code of conduct on him in dealings with outsiders than is imposed by common law, and certainly, by any normal definition, the defendants in this case were "insiders." The general obligation of an "insider" under Rule 10b–5 is best expressed in Speed v. Transamerica Corp., supra, 99 F.Supp. pp. 828–829, where it is said:

> It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. Some courts have called this a fiduciary duty while others state it is a duty imposed by the "special circumstances." One of the primary purposes of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advan-

---

7. 17 C.F.R.
 "§ 240.10-b. Employment of manipulative and deceptive devices.
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a ma-

terial fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

tage to the detriment of uninformed public security holders.

In the *Transamerica* case, Transamerica, through control of Axton-Fisher, planned to acquire the minority stock of Axton-Fisher at reduced prices and to merge it into Transamerica, or to liquidate it, in order to capture the increased value of Axton-Fisher's tobacco inventory. In acquiring Speed's stock, Transamerica failed to inform Speed and other stockholders of the true value of the inventory, the improvement in earnings since a year-old annual report, and Transamerica's ultimate plan of merger or liquidation with regard to Axton-Fisher. Recovery was permitted because of the plan to merge, dissolve or liquidate Axton-Fisher, which, in the view of the Court, made the non-disclosure of increased earnings and increased value of the tobacco inventory actionable under the rule.

■■ The *Transamerica* case and the majority view, as expressed by the decisions to which reference has been made, seem clearly to indicate that something less than common law fraud is necessary to establish a cause of action under Rule 10b–5. Particularly is this so when the majority view is compared with the elements of fraud under Maryland law, as set forth in Suburban Properties Mgmt., Inc. v. Johnson, 236 Md. 455, 204 A.2d 326 (1964). In the view of the Court, Rule 10b–5 should be so construed to give effect to its remedial purpose and the remedial purpose of the Act under which it was adopted. S. E. C. v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). It follows that proof of common law fraud is not required to sustain a cause of action under Rule 10b–5.

■ It is certain, however, that the information not disclosed or misstated, in order to constitute a violation of Rule 10b–5 must be material. List v. Fashion Park, Inc., 340 F.2d 457 (2 Cir. 1965); S. E. C. v. Texas Gulf Sulphur Co., supra, p. 280. And most of the authorities require some reliance by the plaintiff upon the data that was furnished. Jan-

igan v. Taylor, 344 F.2d 781 (1 Cir. 1965); Kohler v. Kohler Co., supra, 208 F.Supp. p. 823; 3 Loss, supra, pp. 1765–1766. In List v. Fashion Park, Inc., supra, 340 F.2d p. 463, the Court defined reliance as "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." And, in Speed v. Transamerica, supra, 99 F.Supp. p. 843, the Court said that insiders when acting as buyers were required "to disclose any and all material facts which would be likely to influence persons receiving the offer, in their decision to accept or decline the offer made." Of course, as pointed out in 3 Loss, supra, at p. 1463, "an insider is under no obligation to give the ordinary investor the benefit of his superior financial analysis," and Blackstone Mem. Library Ass'n v. Gulf, M. & O. R. R. Co., 264 F.2d 445, 450 (7 Cir.), cert. den., 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959), and List v. Fashion Park, Inc., supra, establish that information may be so speculative as not to require an insider to disclose. Such information may be also *de minimis* and not material, Kohler v. Kohler Co., supra, 208 F.Supp. at p. 821. See also, List v. Fashion Park, Inc., supra, 340 F.2d at p. 463. A factor which may influence the determination of materiality and the related element of reliance is the background and experience of the non-insider. Kohler v. Kohler Co., supra; List v. Fashion Park, Inc., supra. In sum, the correct rule would seem to be as stated in Kardon v. National Gypsum Co., supra, 73 F.Supp. p. 800, that insiders are held liable for their profits for failing "to disclose a fact coming to their knowledge by reason of their position, which would materially affect the judgment of the other party to the transaction"—a test largely objective as to what is material, and partly subjective as to what would influence the seller's decision.

When these rules are applied to the facts which have been found, the Court concludes that the plaintiffs have each proved a cause of action.

## APPLICATION OF LEGAL PRINCIPLES

■ The Court finds that Leonard and Julius Rosen, beginning in February, 1959, formulated and embarked on a plan to acquire stock of Gulf American. Though circumstantial, evidence of the concurrence of the availability of cash from the sale of the assets of Charles Antell & Co., the frequency of stock acquisitions within a short period after February, 1959, and the pattern of acquisitions, i. e., (a) the purchase first from Kovens and Jacobson, who were the initial principal promoters of the securities of Gulf American, (b) the communication of the fact of the Kovens-Jacobson purchase to the Klaff Group, the next largest stockholders of Gulf American, and (c) the furnishing of information to Holtzman prior to the time that he would probably be consulted by Poland, make the inference of such a plan inescapable.

The plan to acquire stock of Gulf American was not in itself illegal, but the manner of execution and the misrepresentation and the material non-disclosures made to the plaintiffs in connection therewith, in the context of the plan, violated Rule 10b–5. First, the misrepresentations and non-disclosures to Baumel will be commented on:

Baumel was told that Gulf American needed money. The statement was literally true, but the making of this representation and the context in which it was made in the view of the Court created a duty to make a specific disclosure why Gulf American needed money and, in particular, to disclose that Gulf American's sales were exceeding all expectations so that, because the sales were made on an installment basis, Gulf American needed additional funds to acquire more land and to develop that which had been sold. It is true that the record discloses that Baumel had some knowledge of a rising trend of sales, but the full extent of the rise was not known to him. Conversely, Leonard and Julius Rosen and, through them, Rosen Investment Corporation, knew on a day-to-day basis net land sales, exclusive of cancellations, and the extent of collections. The non-disclosure of the volume of sales, under the circumstances, was in itself a violation of Rule 10b–5.

Rule 10b–5 was also violated by the defendant's failure to disclose deferred profits during the part of fiscal 1959 to the date that the purchase of Baumel's stock was negotiated. On the basis of the expert accounting testimony, the Court does not find that the accrual method of accounting was proper for all circumstances, but the Court is in full agreement with Gulf American's accountants (London and Selenkow) that the installment method of accounting tended to conceal the real success of the Gulf American enterprise in its beginning stage. While the use of the accrual method of accounting would not be provident for income tax purposes and other usual business purposes, a purchase of stock by an insider would, in the view of the Court, require a specific disclosure to an unsophisticated outsider of deferred profits which had accrued since the last financial statement. It should be noted that the last financial statement was only a few days short of a year old when the Baumel purchase was effected. Under these circumstances, and in the context of the affirmative statement that Gulf American needed money, disclosure of the report on which a $600,000 bank loan had been obtained and which showed that deferred profits of $15,000 had accrued on the stock purchased from Baumel for $10,000, should have been made.

Disclosure should also have been made of the fact of the bank loan as such. When Leonard Rosen represented that Gulf American needed money, and that Baumel's stock was needed to obtain money, an affirmative duty to disclose that Gulf American had obtained a loan from an outside lender in the amount of $600,000 without any requirement that the lender receive an equity interest in Gulf American should have been made.

The Court concludes that the non-disclosure of the Kovens-Jacobson at-

tempted rescission constituted a violation of Rule 10b–5. Leonard Rosen, by reason of having employed Kovens and Jacobson to sell securities, and because of their prominence in the community, was chargeable with knowledge that Baumel would have learned that they had sold their stock. Indeed, the record discloses one specific instance in which Leonard Rosen took pains to further knowledge of that fact. Because of the milieu in which Baumel operated, what Kovens and Jacobson did with regard to the stock would have been material to him and a fact on which he would rely. Having furthered the word that Kovens and Jacobson had sold, Leonard Rosen was under a duty to disclose that they were attempting to rescind their sale.

Notwithstanding his testimony to the contrary, the Court does not conclude that acquisition of additional land by Gulf American was material to Baumel; nor was the identity of the purchaser material. The Court also concludes that Gulf American's negotiations with Shields & Co. were too speculative to require disclosure.

In addition to the non-disclosures violative of Rule 10b–5 which have been mentioned, Leonard Rosen made an affirmative misrepresentation, namely, that Baumel's stock was needed to effect further financing for Gulf American. The record is absolutely devoid of any evidence of any intention on the part of Leonard Rosen, Julius Rosen, Rosen Investment Corporation or Gulf American to use Baumel's stock for this purpose at any time. This was a misrepresentation that was material, and the Court accepts Baumel's testimony that he relied on it.

The record shows that Baumel realized a handsome profit when he sold stock for which he paid $1,000 for $10,000, after having held the stock for a period of approximately 21 months, but the substantiality of this profit pales when the share of the deferred profits attributable to this stock interest in fiscal 1959, and the tentative valuation of Shields & Co. on this stock interest are considered. The Court concludes that Baumel's profit was

not the only motivating factor causing him to sell, and the Court further concludes that he was influenced by the material non-disclosures and the material misrepresentation to which reference has been made.

In regard to the acquisition of the Weiner stock, the record shows that Herzfeld himself was an insider, but that, in this transaction, he acted as agent for Leonard Rosen, Julius Rosen and Rosen Investment Corporation.

What has been said as to non-disclosure of deferred profits, volume of sales, attempted rescission of the purported Kovens-Jacobson sale, is applicable to Weiner. The duty of disclosure on the part of the defendants was not lessened because they acted through Herzfeld as an agent. In regard to Weiner, non-disclosure of the bank loan was not made in the same context as non-disclosure to Baumel, and thus would not have been material to Weiner. As in the case of Baumel, there was no duty to disclose acquisition of additional land, the identity of the purchasers, or the discussions with Shields & Co.

In the case of Weiner, the additional statement of Herzfeld that Herzfeld did not think that there was any more money available for the purchase of stock was misleading in the context in which the statement was made. Herzfeld had questioned Weiner as to the rumors that Weiner had heard, and Herzfeld had confirmed explicitly or implicitly that other stockholders had sold their stock. The statement of Herzfeld under these circumstances and in the full context of which it was made would only have the effect of suggesting to Weiner that he should sell and of persuading Weiner to sell on as favorable terms as Weiner could exact.

Weiner also enjoyed a substantial profit on his investment, and realized it within a short period of time. Again, however, its substantiality is diluted by other evidence of the real and potential value of what he sold. The Court concludes that Weiner was substantially influenced by

the material non-disclosures to which reference has been made.

■ It should be noted that application of Rule 10b–5, by its terms, is predicated upon the "use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange * * *." The defendants make no contention that the jurisdictional basis of Rule 10b–5 was not met, and the Court is satisfied that the record shows that the actionable misrepresentations and non-disclosures were part of a course of business carried on in part by use of interstate facilities which operated as a fraud or deceit on plaintiffs. Specifically, the closing for the sale of the Weiner unit was accomplished in part by liberal resort to the mails for the execution of documents and the transmission of funds, and the conveyance of information between Herzfeld and Leonard Rosen. As to Baumel, the record is not as clear, but the Court infers that interstate facilities were used to consummate the transaction. Gulf American's principal office is in Miami, Florida. While Baumel endorsed his Gulf American stock certificates in blank in Herzfeld's Baltimore office, the Court infers that the actual transfer was not complete until the transfer had been made on Gulf American's books and records and new stock certificates to Rosen Investment Corporation issued. Additionally, defendants' overall plan to acquire Gulf American stock was interstate in scope and interstate in execution. Although not illegal as such in its interstate aspects, they provided the context which made the non-disclosures and the misrepresentations to Baumel actionable.

## DEFENSE OF LIMITATIONS AND LACHES

■ The Securities Exchange Act of 1934 does not provide a statutory period of limitations for actions under § 10(b) and the rules and regulations promulgated thereunder. In such a situation, local law provides the statutory period of limitations. Holmberg v. Armbrecht,

327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

■ In Maryland, where the transactions complained of occurred, and the state in which the Court is sitting, the period of limitations for actions based on common law fraud, or the analogous cause of action in Count 1, is three years. 5 Ann.Code of Maryland, Art. 57, § 1. Both of the plaintiffs filed suit more than a week prior to the expiration of three years from the date that defendants purchased plaintiffs' stock. The suits are thus not barred by the Maryland Statute of Limitations.

It is not clear in the present circumstances whether the doctrine of laches, as developed by local law or as developed by federal law, should be applied. Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 214 (9 Cir. 1962), suggests that the federal doctrine of laches should apply when there is no federal statute of limitations. But, since the Court is of the view that by either doctrine of laches the result is identical, the question of which law applies is academic.

■ Under federal law "one raising the defense of laches must show that the delay of the other party has resulted in a disadvantage to him." Royal Air Properties, Inc. v. Smith, 333 F.2d 568, 570 (9 Cir. 1964), and cases cited therein. Under state law, laches can be asserted only when there is an undue lapse of time following discovery of the wrong and prejudice to the defendant resulting from such lapse. Curtis v. Maryland Baptist Union Assn., 176 Md. 430, 5 A.2d 836, 121 A.L.R. 1516 (1939). Under Maryland law, ordinarily, the reasonableness of the lapse of time is measured by the analogous statutory period of limitations. Gloyd v. Talbott, 221 Md. 179, 156 A.2d 665 (1960); Brashears v. Collison, 207 Md. 339, 115 A.2d 289 (1955); Jones v. Burgess, 176 Md. 270, 4 A.2d 473 (1939). In this connection, it should be noted that, while plaintiffs' sales occurred in August, 1959, the record discloses that Baumel did not learn of the extent of the fraud practiced on him un-

til the first public offering of Gulf American securities, which occurred on and after March 8, 1961. As to Weiner's knowledge, the record is silent.

By both federal and state law, prejudice to the defendant is an essential element of the defense of laches. The defense fails, because the record is totally devoid of any evidence that defendants were prejudiced by the lapse of time between the date of plaintiffs' sales, or the date that plaintiffs learned of the fraud practiced on them, and the date on which suit was filed, or that defendants in any respect relied upon plaintiffs' apparent acquiescence in the sales to their detriment.

The Court concludes that the asserted defenses of limitations and laches are both lacking in merit.

### DAMAGES

The differences between the parties with regard to the proper measure of damages if liability is established represents substantial sums of money. The parties have stipulated that Gulf American stock was split 34.6 for 1 on March 1, 1961, and that there was a further stock split of 4 for 1 on March 19, 1962. As of the time of the first public offering of Gulf American's securities on March 8, 1961, 500 original shares would now be equal to 17,300 shares of the stock then outstanding; and as of the time of filing suit, each of the plaintiffs' 500 original shares were equal to 69,200 shares of the stock presently outstanding. Gulf American stock is now listed on the American Stock Exchange.[8]

The plaintiffs contend that they are entitled to restitution of the equivalent of their old stock, i. e., 69,200 shares of the currently issued and outstanding stock, together with money damages measured by the value of the stock when it is returned to them, and the highest value at which it has sold since they sold to Rosen Investment Corporation, less the $10,000 which they were each previously paid, with interest. Defendants, on the other hand, contend that if plaintiffs are entitled to damages the measure of damages is the difference between the price paid the plaintiffs and the fair market value of the stock at the time of the purchase. Stated otherwise, defendants assert the "out-of-pocket" measure of damages as the appropriate one. Since plaintiffs offered no evidence of the fair market value of the stock at the time they sold, defendants' contention, in essence, is a claim that plaintiffs should recover nothing.

Plaintiffs rely principally upon Janigan v. Taylor, 344 F.2d 781 (1 Cir. 1965). There, in a suit to recover damages for violation of Rule 10b–5 in regard to the sale of stock, the plaintiffs, the selling stockholders, were permitted recovery of damages on an accounting theory, rather than for the difference between the price paid them and the actual value of their stock on date on which the sale occurred. The district court found a wilful violation of a federally-created obligation such as the Court has concluded occurred in the cases at bar. The defendant, after purchasing the stock from the plaintiffs, resold the stock at a profit to himself, and the defendant was held liable to the plaintiffs for his net profits realized when he sold the stock. On appeal, the district court's assessment of damages was affirmed. Extended quotation from the opinion of the district court is justified. The Court said:

> With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy something that one would not have bought or would not have bought at that price, and where, by fraud one is induced to convey property to the fraudulent party. In the former case the damages are to be reckoned solely by "the dif-

8. The Court takes judicial knowledge that, as of February 19, 1968, Gulf American stock had a trading range for 1967–68 of 13¾ high and 6⅝ low, and that on that date the mean trading price was 8½. The Wall Street Journal, February 20, 1968.

ference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation.' " * * * On the other hand, *if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party.* It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. *It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.* * * * We may accept defendant's position that there was no fiduciary relationship and that he was dealing at arm's length. Nonetheless, it is simple equity that a wrongdoer should disgorge his fraudulent enrichment. (emphasis supplied) Id., p. 786.

Defendants rely upon Kohler v. Kohler Co., 208 F.Supp. 808, 825–827 (D.Wis. 1962), where the Court found that a plaintiff had proved no actual damages, i. e., the difference between the price he received and the real value of the securities which he had sold on the date of sale and, hence, was entitled to no recovery. The Court relied on § 28 of the Act, which prohibits recovery of "a total amount in excess of the actual damages," and said that actual damages were to be "computed under the federal 'out of pocket' rule applied in fraud actions, i. e., the difference between the price received by the plaintiff and the real or actual value

of the stock at the date of sale." Id., p. 825. It should be noted, however, that this statement was dictum because the Court had previously found that the defendants violated no statutory or common law duties in the negotiation for the purchase of plaintiff's stock. On appeal, 319 F.2d 634, 7 A.L.R.3d 486 (7 Cir. 1963), the Court of Appeals, in affirming the district court, did not repeat the dictum or rest its decision on this ground. The dictum is contrary to the holding in *Janigan.* The limiting language of § 28 (a) is treated in 3 Loss, Securities Regulations (1961 Ed.) pp. 1474, 1624, 1793–1794, as simply precluding double recovery for common law fraud and violation of federal law. Additionally, § 28 (a), by its terms, appears to be applicable only to suits specifically authorized by the Act; the Act does not specifically authorize a suit for violation of Rule 10b–5. Blackstone Mem. Lib. Ass'n v. Gulf, M. & O. R. R. Co., supra, also cited by the defendants, does not appear to be in point.

Broadly read, Janigan v. Taylor, supra, stands for the proposition that in a suit under Rule 10b–5 a defrauded seller is not limited to damages measured by the tort or out-of-pocket rule; where there has been an appreciation in value since the time that he was fraudulently induced to part with his securities, the defrauded seller may resort to a rule of damages or form of relief to recover future profits that he was caused to lose. This the Court conceives to be the proper doctrine to apply in this case, and it is one advocated by the leading writer in the field. 3 Loss, supra, pp. 1792–1794. See also, Speed v. Transamerica Corporation, 135 F.Supp. 176 (D.Del.1955), aff'd, 235 F.2d 369 (3 Cir. 1956): "The injured party is entitled to require the perpetrator to disgorge gains made at the expense of the injured." Id., p. 186. What, then, are the remedies available?

"Fraud may become important either for the purpose of giving the defrauded person a right to sue the fraud-

ulent person for damages in an action of deceit, or its equivalent, or to enable the defrauded person to rescind the transaction. * * * It is undoubtedly true that whenever the circumstances are such as to warrant an action for deceit for inducing a person to enter into a contract, they will certainly warrant avoidance or recision of the bargain." 5 Williston, Contracts (1937 Ed.) § 1487, p. 4153. The remedy of specific restitution following exercise of the power of avoidance is subject, however, to certain limitations. First, it is clear that avoidance must precede the bringing of the actions and the status quo restored before that time. In equitable actions, however, an application of the maxim that equity will treat as done that which should be done, it is not essential that the status quo be first restored; because the court can enter a conditional decree and require mutual restoration of the status quo simultaneously. 2 Restatement of Contracts (1932 Ed.) § 481.

A more basic limitation on the exercise of power of avoidance coupled with resort to the principle of restitution is the historic need to show a basis for equitable jurisdiction. Of course, there are a limited number of situations in which restoration of specific property may be effected by employing the common law writs of replevin or detinue. 5 Corbin, Contracts (1964 Ed.) § 1120. But, shares of stock, requiring formal transfer of title, are a species of property where it is generally necessary to obtain the intervention of equity to effect restitution in kind. 5 Williston, supra, § 1525 pp. 4269–4270. Except for replevin and detinue, the common law provided money damages as the relief available unless a specific ground for equitable jurisdiction were established. 2 Restatement of Contracts, supra, § 489; Restatement of Restitution (1937 Ed.) § 166, comment b.; 5 Williston, supra, § 1525, p. 4270; 5 Corbin, supra, § 1120.

While it cannot be claimed that shares of Gulf American are unique so as to provide the well-established jurisdiction of equity to decree delivery of land, or tangible personal property which is unique, or unique intangible personal property such as a patent, or copyright (see, 2 Restatement of Contracts, supra, § 361 and comments following), equity will act when the fixing of damages presents unusual difficulties in their measurement, or where the uncertainty of correct measurement will potentially result in great injustice to either of the parties. The instant cases have enough of the features of the latter rule to warrant its application. Shares of Gulf American are now listed on the American Stock Exchange and are traded daily, but, as the facts alleged in plaintiffs' motion for modification of the Court's original opinion show, there is a relatively wide trading range.

When it is remembered that plaintiffs were defrauded of the present equivalent of 69,200 shares of Gulf American's stock, a fractional variation in price between its value on the date that a judgment fixes money damages and the date that the judgment is paid may mean that plaintiffs may go uncompensated for substantial injury. It is not entirely clear as of what date damages are to be measured, i. e., (1) the date of tortious conduct, 4 Restatement of Torts (1939 Ed.) § 927(a), (2) a reasonable time after tortious conduct or knowledge thereof, 4 Restatement of Torts, supra, § 927, comment e.; Restatement of Restitution, supra, § 151, comment c.; (3) date of demand after tortious conduct, 4 Restatement of Torts, supra, § 927, comment g.; Restatement of Restitution, supra, § 151, comment e.; or (4) possibly the date judgment is entered. It is not necessary to choose between these seemingly conflicting and overlapping rules, because the same considerations would apply to whichever one is adopted. It should be added that the sums involved in the litigation and the relatively few cases on the subject both indicate that the possibility of appeal and consequent delay in the payment of any judgment even if it should be affirmed are not

lightly to be dismissed. In these events, the risks to plaintiffs are manifest.

Presumably, the purpose of awarding money damages would be to enable plaintiffs to go into the market and purchase the stock of which they were wrongfully deprived. In addition to the risk of fluctuations in market value, there are other factors to be considered that make an exact measurement of money damages extremely difficult, if not impossible. The effect of the purchase of two blocks of 69,200 shares of Gulf American stock on its market value is unknown and, at best, difficult of estimation. What brokers' commissions would be payable would be difficult of estimation. Certainly, if plaintiffs are to be restored to their shares, a judgment for money damages must include expenses of purchases as well as the purchase price; but whether the stock be purchased in a single block or purchased in smaller lots, with the effect that resolution of that issue would have on commissions to brokers, is not presently ascertainable, yet is presently avoidable if the Court exercises its power to grant equitable relief.

 Had plaintiffs elected to press their optional right to money damages, rather than the specific return of personal property, plaintiffs would have been entitled to money damages at least for accretions in value within a reasonable time after they discovered or had reason to know of defendants' tortious conduct (Restatement of Torts (1939 Ed.) § 927, comment e.), or to its highest value reached within a reasonable time after the tortious conduct (Restatement of Restitution, supra, § 151, comment c.). Plaintiffs in their motion for modification of the original opinion make plain that their principal interest is in the return of their stock. The Court does not believe that plaintiffs are entitled to both, especially where plaintiffs offered no evidence to show that they would have sold their stock when it reached its highest value (see, Restatement of Restitution, supra, § 151, com-

ment c.); and, hence, plaintiffs may not have both the return of their stock and damages measured by the difference between its value on date of return and highest value which plaintiffs were deprived of ownership, with interest.

In concluding to decree recision and the return of the stock, the Court has been mindful of possible inequities to defendants. Restatement of Restitution, supra, §§ 142; 148, comment c. First, it may be stated that nothing in the record suggests that defendants have parted with possession of the stock, or otherwise changed their positions in reliance upon the fact of ownership. As has already been shown, plaintiffs are not barred by limitations or guilty of laches. The only other factor to be considered is the extent to which, if at all, plaintiffs' shares have increased in value because of the toil and energy expended by Julius and Leonard Rosen in bringing about the marked success of Gulf American. As to this, the Court concludes that it presents an insufficient reason to reject the manifest fairness of granting equitable relief: Leonard and Julius Rosen owned 52% of the stock of Gulf American since its inception and until the time they embarked on their scheme of purchasing the stock in the hands of other investors. By execution of their scheme, they acquired plaintiffs' shares which amounted to 2% of the stock of Gulf American, and they acquired other stock which raised the percentage of their holdings to 79.6% of the total equity. By the time that plaintiffs' stock was purchased, Leonard and Julius Rosen had acquired some other stock, so that their total ownership had been raised from 52% to 67.5%.

What Leonard and Julius Rosen did to advance the success of Gulf American and the extent to which its stock appreciated in value as a result of their efforts cannot, on these facts, be said to be fairly attributable to their owning 2% more stock than they would have owned had they not defrauded the plaintiffs. Their ownership was otherwise so substantial that it can be presumed that

they had every incentive to make Gulf American successful, irrespective of their acquisition of plaintiffs' stock, and the results of their efforts redounded in most part to the stock they acquired initially and from other sources. To the extent that it did not "[I]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." Janigan v. Taylor, supra, 344 F.2d p. 786.

▮ Plaintiffs, of course, must return the consideration which was paid them. Nothing in the record establishes that Gulf American paid dividends, and the Court will presume that it did not, so that defendants received no tangible benefit from ownership of plaintiffs' stock. Plaintiffs, however, each had the use of $10,000 in the interim. In refunding these sums, plaintiffs will be required to pay simple interest at the rate of 5%, until the date of repayment—the amount which the Court concludes they may have safely earned by use of the money.

▮ In exchange therefor, defendants, jointly and severally, will be required to return to each of plaintiffs 69,200 shares of the common stock of Gulf American, together with any dividends which may be declared and paid thereon from the date of decree until the date of delivery, and defendants shall pay any transfer taxes which may be imposed thereon. Plaintiffs' prayer for counsel fees is denied. The decree may also provide that in the event defendants do not own sufficient shares to provide full restitution to plaintiffs when said decree becomes final, plaintiffs may obtain a judgment for money damages for the market value of the purchase of such shares (as affected by such purchase), together with the costs of purchase upon application to the Court and presentation of proper proof. Restatement of Contracts, supra, § 481, comment c.; 3 Loss, supra, pp. 1792–1793.

## MOTION AND DEFENSE UNDER RULE 17

▮ Ten days before the taking of testimony was completed, Weiner disclosed that after he had acquired his unit of Gulf American securities he sold 25% to Alfred Fleishman and 25% to Morton Shaw.[9] He also disclosed that there were consultations among the three in connection with the sale of the unit in August, 1959.

Defendants assert that the complaint in Civil Action No. 14014 should be dismissed for failure to prosecute the action in the name of the real party in interest, in compliance with Rule 17(a), F.R.Civ.P., because Fleishman and Shaw each owned 25% of the stock and, if recovery is to be had, each is entitled to 25% of the total damages to be fixed. Plaintiffs contend vigorously to the contrary and alternatively state their willingness to amend the complaint to make Fleishman and Shaw additional plaintiffs.

From the record, the Court finds that, at least since June 30, 1958, defendants were aware that Fleishman had an interest in the stock registered in the name of Weiner. Prior to that date Gulf American raised additional capital by loans *from its existing stockholders*. By letter dated June 30, 1958, dictated by Leonard Rosen and signed "Leonard," Leonard Rosen transmitted a Gulf American note in the principal sum of $1,250 to Weiner, and a second Gulf American note in like amount for "A. M. Fleischman," who was described as "your associate in this matter according to the records we have." Leonard Rosen also requested Weiner to furnish Fleishman's full name and address. Because this financing was limited to stockholders of Gulf American, the Court infers that Rosen knew that Fleishman had an interest in the stock registered in the name of Weiner.

9. The trial began December 7, 1965. Weiner testified on December 13, 1965. The last evidence was presented and the record closed on December 23, 1965. Final argument was not presented until almost one year later.

Plaintiffs rely principally on Doherty v. Mutual Warehouse Company, 245 F.2d 609 (5 Cir. 1959), for the proposition that Weiner is the real party in interest, and that he may maintain the action for himself, Shaw and Fleishman without joinder of the latter two as parties-plaintiff. The *Doherty* case was a suit to compel the declaration of dividends. Since, under the Uniform Stock Transfer law in effect in the jurisdiction in question, a corporation was authorized to pay dividends to the record owner of shares of its stock, and since Doherty was the record owner, it was held that he could maintain the suit, notwithstanding that he held the stock as attorney for Marie McIntyre Murphy, the "real" owner of the stock standing on the corporation's records in Doherty's name. The result was reached by construing Rule 17(a) in essence to mean that an action shall be prosecuted in the name of the party who by the substantive law has the right sought to be reinforced, and, reasoning from that principle that the person entitled to the payment of dividends, i. e., the record owner, had the right to payment if their declaration were forced.

That the Court correctly determined the rationale of Rule 17 is supported not only by 3 Moore's, Federal Practice (2d Ed.) ¶ 1702, which it cited, but also by 2 Barron and Holtzoff, Federal Practice and Procedure (Wright Ed.) § 482. In this Circuit it has been held that where a sales agent executed in its own name as seller a contract for the sale of coal to be mined by its principal, whose identity was known to the buyer, billed coal in its own name and received and remitted payment to its principal, the agent could maintain a suit in its own name to recover from the buyer the difference between the contract price and minimum price established under the Bituminous Coal Act of 1937. *Costanzo Coal Min. Co. v. Weirton Steel Co.,* 150 F.2d 929 (4 Cir.), cert. den., 326 U.S. 765, 66 S.Ct. 147, 90 L.Ed. 460 (1945). The rationale of *Costanzo* was that the agent could recover in its own name for the benefit of the principal because the

principal had authorized the agent to assume the position of owner of the goods and the buyer had dealt with the agent as owner. In the cases at bar, Shaw and Fleishman permitted Weiner to occupy the same position, as did the defendants.

Under the law of both Maryland and Florida, the record owner of stock may be treated by both the corporation whose stock is so owned and third persons as the owner of the stock. Certainly, under the law of both jurisdictions in effect in 1961, title to Weiner's stock could by transferred only by delivery of the certificate therefor *endorsed by Weiner.* 2 Ann. Code of Md., Art. 23 § 100 (1957 Ed.); Fla.Stat. § 614.03, F.S.A. (1956). If rescission of the sale and a return of the stock were decreed, the stock would be returned in the name of Weiner. The fraud perpetrated was practiced on Weiner, whose endorsement on the certificate and from whom delivery of the certificate were obtained. It follows that the principle established by the *Doherty* case is thus applicable in the Weiner case, and that Weiner is entitled to maintain the damage aspect of the suit in his own right.

There are additional reasons to support this conclusion. The Court has found that Rosen knew of the existence of Fleishman for more than four years prior to the institution of the suit. The interest of Fleishman was confirmed, and the interest of Shaw disclosed, ten days prior to completion of the record in the Weiner case. Even though the case was tried non-jury, defendants made no effort to subpoena Fleishman or Shaw as adverse witnesses, or even to depose them for purposes of discovery. Not only was there ample opportunity to take their discovery depositions within the schedule under which the trial proceeded, the fact that the trial was conducted nonjury would have permitted reasonable recesses for that purpose had an appropriate request been made. Although, as to Shaw, there are substantial differences in the lapse of time in the instant case and in the case of McLouth Steel Corp.

v. Mesta Machine Co., 116 F.Supp. 689 (E.D.Pa.1953), aff'd, 214 F.2d 608 (3 Cir. 1954), cert. den., 348 U.S. 873, 75 S.Ct. 109, 99 L.Ed. 687 (1954), the principle of waiver recognized and applied in the latter would seem applicable.

If defendants did not waive any right they may have possessed to have Fleishman and Shaw joined as parties-plaintiff, the only reason which suggests itself as to how they may have been prejudiced by non-joinder is the possibility that Fleishman or Shaw received information concerning Gulf American which was communicated to and relied on by Weiner as a motivating factor in his agreement to sell the unit of Gulf American securities in August, 1959, or that Weiner was persuaded to sell because of the desires of Fleishman or Shaw, and not because of the non-disclosures made to him by Herzfeld. A fair reading of the record negates this possibility. Weiner testified that before he went to see Herzfeld, Fleishman had heard rumors concerning sales of stock by Jacobson and the Klaff Group, that Gulf American was in desperate need of money, and that stock was being purchased in order to get a Philadelphia group interested in investing money in Gulf American. Fleishman communicated this information to Weiner. He further testified that he, Fleishman and Shaw discussed the matter, and all agreed that Weiner would go to Herzfeld to seek information. After Weiner went to Herzfeld, he reported to Fleishman and Shaw what he had learned and, on the basis of the Herzfeld conversation, all agreed to sell the unit if Weiner could get $20,000 or $21,000. In arriving at this decision, Weiner was the predominant voice, because all of the stock was in his name, he had 50% beneficial ownership and he was the one who negotiated with Herzfeld.

Plaintiffs have consistently maintained that the testimony of Shaw and Fleishman was merely cumulative and for that reason that they were under no duty to produce them as witnesses. The record supports this view. Rule 17(a) did not require that Shaw and Fleishman be

parties-plaintiff. If defendants thought that Weiner's recovery, or Shaw's and Fleishman's share of Weiner's recovery, could be defeated by their testimony, it was incumbent on defendants to produce them.

Defendant's motion to dismiss, based on Rule 17, cannot apply to Weiner to the extent of his 50% beneficial interest since, as to that, both the legal and beneficial interest is before the Court. The Court concludes that dismissal will not lie under Rule 17(a) as to the remaining 50% owned in aggregate by Fleishman and Shaw.

Counsel may present a decree in conformity with the views expressed herein.