Milton J. BAUMEL, Appellee,

v.

Leonard ROSEN and Julius J. Rosen, and Rosen Investment Corporation, Appellants.

Earl R. WEINER and Anita L. Weiner, Appellees,

v.

ROSEN INVESTMENT CORPORATION, Leonard Rosen, and Julius J. Rosen, Appellants.

Nos. 12648, 12649.

United States Court of Appeals Fourth Circuit.

Argued March 4, 1969.

Decided May 22, 1969.

H. Vernon Eney and Charles C. W. Atwater, Baltimore, Md. (Mylander & Atwater, Robert R. Bair, Stuart H. Rome, Alan D. Yarbro, Richard W. Emory, Jr., and Venable, Baetjer & Howard, Baltimore, Md., on brief) for appellants.

Morton E. Yohalem, Washington, D. C., and George Cochran Doub, Baltimore, Md. (Weinberg & Green, Baltimore, Md., H. Don Cummings, Washington, D. C., Zelig Robinson, Baltimore, Md., Joel Yohalem, Washington, D. C., and Lee N. Koehler, Baltimore, Md., on the brief) for appellees.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges:

ALBERT V. BRYAN, Circuit Judge.

The Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and an accompanying enforcement rule are the basis for the decrees now on appeal. These orders rescind the purchases by the defendants in 1957 from the plaintiffs of capital stock of the Gulf American Company, a Florida corporation.[1] Affirmative misrepresentations by the defendants and their reticence in regard to other facts were found by the District Court, and account for the decision. The purchasers appeal. We, too, uphold the plaintiffs but refuse rescission and award damages.

Section 10 of the Act, 15 U.S.C. § 78j (b) declares:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. June 6, 1934, c. 404, § 10, 48 Stat. 891."

Rule 10b–5, 17 C.F.R. § 240.10b–5, implements the statute in this way:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The Rule was the main predicate of each action.[2] J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed. 2d 423 (1964); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 847 (2 Cir. 1968). In a collateral count each plaintiff-vendor also pleaded common law fraud and deceit for vacation of the transaction. Jurisdiction of the statutory claim is rested on § 27 of the Act, 15 U.S.C. § 78aa,[3] with the common law case as a pendent controversy. However, the latter claim need not be noticed, because no decision in the case was put upon it.

Leonard Rosen and his brother Julius organized the Gulf company to utilize their experience in instalment selling for the sale of lots in Florida. They sub-

1. Originally its name was Gulf Guaranty Land and Title Company.

2. These are appeals in two actions heard together in the District Court. One was brought by Earl R. Weiner, here treated as the sole plaintiff, although his wife joined with him; the other case was brought by Milton J. Baumel. Since the issues at trial and on review are common to both causes, they are presented together here. The only differences are the names of the plaintiffs. The cases were against the same parties, but one of the defendants, Rosen Investment Corporation, may be ignored as playing no significant part in the litigation. The individual defendants exclusively owned this corporation and any stock transfers to it are treated herein as transfers to the individuals.

3. "The district courts of the United States \* \* \* shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all' suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. \* \* \*"

scribed equally, together paying $52,000, for 52% of the authorized capital stock and simultaneously lending Gulf $50,000. At all times the brothers were directors, principal officers, and majority stockholders of the corporation, with Leonard its chief and leader.

To obtain more funds, they planned additional financing through sale of "units". Selling for $11,000, each unit consisted of a $10,000 10% debenture of the corporation, and 500 shares of Class A common stock representing 1% of the entire capital stock. Distribution was accomplished through sales to friends engaged in the commerce of Baltimore, Maryland, the Rosens enjoying a prominent social and business place throughout the city. Sales of the units commenced in October 1957. In this offering plaintiff-appellee Milton Baumel, a successful restaurateur, bought one unit in November 1957; in the same month Leonard Rosen sold a unit to the other plaintiff-appellee, Earl Weiner, a dentist.

The Rosens while in control and direction of the company purchased the Baumel and Weiner units in August 1959— $10,000 for the stock and $10,000 for the debenture—and these transactions are the centerpiece of this case. The acquisitions were in accordance with a plan of the Rosens to recapture all of the stock units which they had sold upon inauguration of the Florida project. The idea of repossessing the stock was rightful, but the means employed were wrongful, the District Court concluded.

The opinion of the District Court, Baumel v. Rosen, 283 F.Supp. 128 (D.C.Md. May, 1968) so comprehensively and clearly recounts the circumstances of each purchase that to retell them here would be nothing more than a work of supererogation. It found that the purchases from Baumel and Weiner, as well as from others, were procured through affirmative misrepresentations of the financial condition of the company, and under nondisclosure of material incidents in the corporate operations. Specifically, the finding was that the avowed inducements falsely pictured the corporation as desperately in need of funds, without which it would be unable to continue operations; that these moneys could be obtained only by granting lenders participation in the venture; and that for this purpose outstanding stock was needed. Matters found not divulged included these: the failure of the Rosens to reveal the proven ability of the corporation to borrow from a reputable banking house; the failure to make known that the corporation's sales of properties had far exceeded expectations; and the exhibition of an audit report to stockholders which was not entirely accurate, because the method of accounting employed did not note potential profits.

The Court recognized that the surrender by Baumel and Weiner of their stock was at a price returning them a profit of 900%. Against this, however, the Court found that they would not have disposed of their stock even at that figure, if they had been aware of the untruth of the avowals and the deception of the omissions, for there was then every reason to believe, as subsequent developments confirmed, that a far, far handsomer, if not fabulous, gain would be realized by retention of the stock.

In sum, the court found that the Rosens directly or indirectly had consciously imposed upon Baumel and Weiner, who believed the persuasions advanced and acted upon them in parting with their stock.

In these conclusions the Court expounded the purpose of the Act and Rule, and altogether soundly, we think. It noted the dominance by the Rosens of the corporation and their superior and intimate knowledge of its actual and potential achievements; it observed the inferior acquaintance of the plaintiffs with the internal economy of Gulf. In this position the Court declared it the bounden duty, under the Act and Rule, of the Rosens to withhold no pertinent information from the minority shareholders, and of course to refrain from positive avouchments in whole or in part factually untrue. For violation they were liable.

On August 16, 1962 Baumel and Weiner renounced their sales to the Rosens by filing these actions. The complaint in each instance asked for rescission, and for restitution by delivery to the plaintiffs of the current equivalent in kind of the 500 shares purchased by the defendants in 1959. In the interim, the Gulf stock was split on March 1, 1961 at the rate of 34.6 shares for 1, giving 17,300 shares for each 500-unit. Another split occurred on March 19, 1962, at the rate of 4 to 1. At the time of suit each initial unit had thus increased to 69,200 shares.

Upon these findings, and its determination of the violation of Rule 10b-5, the Court at first granted the plaintiffs damages. On reconsideration, upon plaintiffs' motion, it granted rescission instead of damages, and directed the defendants to transfer to each of the plaintiffs a certificate for 69,200 shares of the outstanding stock of Gulf. The defendants can comply but, aside from denying liability, they deny the soundness of the measure of recovery.

■ I. On this appeal of the Rosens we cannot say that the subordinate and ultimate findings of the trial judge are unwarranted as "clearly erroneous". Nor do we discern law error in his reading or employment of the Act and Rule.

■ II. However, we are not satisfied that the plaintiffs are entitled to rescission. Their neglect to act vigilantly in disavowal of the agreement cost them the right to rescind, even if we assume there was such a right. Plaintiffs sold their stock in August 1959. Baumel states that at the end of the month or in early September he believed he had been "taken", i.e., that the price he received was far less than the then value of the securities. Weiner testifies that at Thanksgiving or Christmas 1959 he had been told by a friend that Gulf "had plans to go public and that the stock was worth quite a bit of money more than I had received for it".

■ Nevertheless, neither plaintiff renounced for three years—in August 1962 when they instituted these actions. Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

■ This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of word putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. See Friedman, Delay As a Bar to Rescission, 26 Cornell Law Quarterly 426, 432, text at footnote 31 and authorities cited therein (April 1941). If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

Here, no such vigor was exhibited. Indeed, although plaintiffs are not chargeable with complete awareness of the knavery earlier than March 1961— when the Gulf stock went public, and more than 14 months after they had wind of the malodor—they pondered another 18 months before disclaiming the sale.

The books teem with support for these propositions. Thus the Court said in McLean v. Clapp, 141 U.S. 429, 432, 12 S.Ct. 29, 30, 35 L.Ed. 804 (1891):

" ' * * * He [the rescinder] is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to *speculative property like that here in question,* which is liable to large and constant fluctuations in value. * * * ' " (Accent added.)

Apt here, especially, is Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 592–593, 23 L.Ed. 328 (1875). There the nature of the subject of the sale was noted as a factor in determining the timeliness of the repudiation. It is put in these words:

"The *fluctuating character and value* of this class of property is remark-

ably illustrated in the history of the production of mineral oil from wells. Property worth thousands today is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit. (Accent added.)

"While a much longer time might be allowed to assert this right in regard to real estate whose value is fixed, on which no outlay is made for improvement, and but little change in value, the class of property here considered, subject to the most rapid, frequent, and violant fluctuations in value of any thing known as property, requires prompt action in all who hold an option, whether they will share its risks, or stand clear of them."

This precept has been carried into decisions under the Securities Exchange Act and Rule 10b-5, e.g. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, etc., 303 F.2d 527, 532 (10 Cir. 1962), where the Court pointed out:

"In view of the speculative nature of the transaction and with a fluctuating market, the law required the appellant to act promptly or waive its right to rescind. Where parties have the right to rescind, they cannot delay the exercise of that right to determine whether avoidance or affirmance will be more profitable to them. This is particularly true where the transaction is one of a speculative nature. * * *"

Further rationale for the requirement of immediacy is that every day's lapse renders more difficult the very aim of rescission: to return the parties to statu quo ante. That obviously is well exampled here.

III. Damages, nevertheless, are recoverable for the imposture. Like the District Court the yardstick, we think, for the ascertainment of damages in a case of this kind is the gauge stated by Chief Judge Aldrich in Janigan v. Taylor, 344 F.2d 781, 786 (1 Cir. 1965), cert. den. 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). His outline is this:

"On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them".

In accord is Myzel v. Fields, 386 F.2d 718 (8 Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Nothing contra in the decisional or statutory law of Maryland has been cited to us and we have found none. Moreover, we are of opinion that Federal rather than State law provides the measure when, as here, recovery is put upon a Congressional enactment. See J. I. Case Co. v. Borak, supra, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

The application of this yardwand to the circumstances of this case is the next question. On March 1, 1961, as already mentioned, there was a stock split and the former interest of each plain-

tiff then grew to 17,300 shares. That was the time of the first public offering of the stock, and it was declared by the prospectus issued by the company to have a value of $5.00 a share when purchased along with debentures. On March 9, when the stock was purchasable without the debentures, the selling price was between $7.50 and $8.50.

We do not agree with the appellees' contention, accepted by the District Court, that the reckoning of their reimbursement should include reference to the second stock split, which occurred March 19, 1962 and raised the prior interest of each plaintiff to 69,200 shares. The trial court found, and plaintiff Baumel concedes, that March 8, 1961 was the day on which he knew, or should have known, of his dupery, for he was by then apprised of it by the stock split and public offering. It seems to us that under the admitted facts, Weiner too is chargeable with notice at that time. Hence, a day within a fair range of these events should be taken as the date to be used in the calculation of damages.

This conclusion is not inconsistent with the view of the trial judge, which he expressed in this way:

"Had plaintiffs elected to press their optional right to money damages, rather than the specific return of personal property, plaintiffs would have been entitled to money damages at least for accretions in value within a reasonable time after they discovered or had reason to know of defendants' tortious conduct (Restatement of Torts (1939 Ed.) § 927, comment e.), or to its highest value reached within a reasonable time after the tortious conduct (Restatement of Restitution, supra, § 151, comment c.)."

283 F.Supp. at 147.

Because of the volatile nature of first-offering stock prices and in the circumstances of this case, we conclude that March 9, 1961—the first occasion of ex-debenture sale—should be taken as the critical date for assessing the damages. For this purpose we look to the spread of the quotation on that day and settle on the mean of $8.00 a share.

Our determination, then, is that each plaintiff should be awarded a judgment computed at the rate of $8.00 per share upon the 17,300 shares to which he would have been entitled had he retained his stock, together with interest thereon, at the rate of 6% per annum, from March 9, 1961 until paid, less the sum originally paid him for his shares with interest thereon at 6% from the date he was paid.

It must be recalled that while a defrauding party is not to be excused, neither is he to be punished. This is not only within the guidance of the Securities Act, 15 U.S.C. § 78bb(a), but it is the generally accepted pattern. The proposition is well stated by Friedman, Delay As a Bar to Rescission, supra, 26 Cornell Law Quarterly 426, 447 (April 1941) as follows:

"It may be said that one guilty of fraud is entitled to no undue consideration from the court. Yet the policy of the law on its civil side is not punishment. A fair attempt to compensate for wrongs is the aim".

This result is attained, we think, in the damages we have allowed. Although the court was discussing punitive damages, not relevant here, the observation of the opinion in Green v. Wolf Corporation, 406 F.2d 291, 303 (2 Cir. 1968) is noteworthy:

"* * * 'We do not believe that Congress intended the Securities and Exchange Act to be used as a vehicle for the recovery of judgments that could often be grossly disproportionate to the harm done."

\* \* \* \* \* \*

"Accordingly, we conclude that punitive damages are not authorized in private actions under § 10(b) and Rule 10b-5."

Other issues in the case, such as the pleas of the statute of limitations, laches and the non-joinder of certain parties, we find without merit.

Affirmed in part; reversed in part.