491 F.2d 402
 Fed. Sec. L. Rep. P 94,339, Fed. Sec. L. Rep. P 94,386
ROCHEZ BROS., INC., a Pennsylvania Corporation, Appellant in
No. 73-1257,
v.
Charles R. RHOADES, Appellant in No. 73-1258, and M S & R
Inc., a Pennsylvaiacorporation.
 Nos. 73-1257, 73-1258.
 United States Court of Appeals, Third Circuit.
 Argued Oct. 12, 1973.
Decided Dec. 21, 1973, As Amended Jan. 28, 1974, Rehearing
Denied Jan. 29,1974.
 
 Ralph S. German, William S. Smith, Houston, Cooper, Speer & German, Pittsburgh, Pa., for Rochez Bros., Inc.
 W. Gregg Kerr, Jr., C. Kent May, David E. Tungate, David L. Parmer, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Charles R. Rhoades.
 Edmund S. Ruffin, III, Peter G. Veeder, Thorp, Reed & Armstrong, Pittsburgh, Pa., for M S & R, Inc.
 Before HASTIE, VAN DUSEN and ADAMS, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 In these appeals both parties seek reversal of district court, 353 F.Supp. 795 orders granting judgment with damages against an individual defendant, Charles R. Rhoades, in an action under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b),[1] and Rule 10b-5[2] of the Securities and Exchange Commission, and dismissing such action against a corporate defendant, MS&R, Inc. Plaintiff contends that the damages are inadequate and the judgment should also have been entered against the corporate defendant, whereas defendant Rhoades contends that judgment should have been entered in his favor on the liability issue.
 
 
 2
 The case arises from the sale of 50% Of the issued and outstanding stock of MS&R, Inc. by Rochez Bros., Inc. to Charles R. Rhoades on November 13, 1967, in accordance with an agreement of sale dated September 16, 1967, for the price of $650,000. The interest of Rochez Bros. in MS&R began on July 1, 1964, when Rochez Bros. bought 50% Of the stock of MS&R for $272,500. At the same time Rhoades, who already owned 33 1/3% Of the MS&R stock, brought his stock ownership up to 50%. This evenly divided stock ownership continued until November 13, 1967When Rhoades bought out Rochez Bros., thus becoming the sole owner of the stock of MS&R. During this time, Rhoades was full-time Chairman of the Board, Chief Executive Officer, and President of MS&R. Joseph Rochez, the President of Rochez Bros., was a part-time Vice President of MS&R and a member of its three-man Board of Directors. Rhoades ran the business activities of MS&R on a day-to-day basis, while Rochez was primarily concerned with general policy matters in relation to finance and growth of the company.
 
 
 3
 As a result of increasing dissension between the two men, founded both in personality differences and business disagreements, boht Rochez and Rhoades were authorized by the Board in the spring of 1967 to contact prospective purchasers of the company, but these efforts produced no results. At this time, they also began discussing a buy-sell agreement whereby one of them would buy out the other's interest. Finally, on September 11, 1967, Rochez Bros. named the price for which it was willing to sell its stock in MS&R to Rhoades, subject to the condition that the sale should be concluded by noon on September 15 and that Rhoades should put $50,000. in escrow, to be forfeited if no closing occurred. On September 16, 1967, an agreement of sale was executed, under which Rhoades bought the stock of Rochez Bros. in MS&R for $598,000.2A The closing and delivery of the stock certificates to Rhoades took place on November 13, 1967.
 
 
 4
 Prior to the September 16 agreement, Rhoades answered a newspaper advertisement placed by one Wingate Royce, of New York City, in January or February of 1967. Royce phoned Rhoades, who told Royce that he was interested in discussing financing for MS&R. Rhoades then sent Royce MS&R financial information and made an appointment for Royce to come to Pettsburgh on April 21, 1967. Royce did visit the MS&R plant on that date and was introduced by Rhoades to Rochez, who declined to hire him to find a purchaser for MS&R. Rhoades, however, did agree to retain Royce to find leads and make introductions to bring about the sale of MS&R. Rhoades never informed Rochez Bros. of the employment of Royce or of the negotiations for the sale of MS&R that followed.
 
 
 5
 Thereafter, in May 1967, Royce brought MS&R as a potential acquisition to the attention of J. Walter English, of Simmonds Precision Products Co. In May 1967, English visited MS&R after Royce had informed Rhoades that Simmonds was a potential purchaser. In late August or early September 1967, Rhoades and his production assistant went to Hartford to visit a Simmonds plant. Upon arrival at the Hartford airport, Rhoades telephoned his Pittsburgh attorney's office to learn how the buy-sell negotiations with Rochex Bros. were progressing. They then visited the plant and dined with Simmonds personnel. On the return trip to Pittsburgh, they rode with Geoffrey Simmonds in the latter's company plane, and Simmonds toured the MS&R plant before continuing to a further destination.
 
 
 6
 Royce also informed Rhoades of the interest of Carus Chemical Company in acquiring MS&R stock. In the latter part of August 1967, the Carus brothers visited the MS&R plant and told Rhoades that Carus would be interested in purchasing MS&R stock.
 
 
 7
 Upon conclusion of the agreement of September 16, 1967, for the purchase of the Rochez stock, Rhoades increased his efforts to sell MS&R. On September 18, 1967, he telephoned both Simmonds and Carus and began negotiations that led to offers from both. However, the Carus offer was unattractive to Rhoades since it in effect required him, continuing as director, to earn the purchase price out of future profits of MS&R. The Simmonds offer also fell through, both because cause Rhoades found it unattractive taxwise and because Simmonds did not wish to become involved in a possible lawsuit with Rochez Bros. Finally, in April 1968, Rhoades began negotiations with Esterline Corporation, through the initiative of Western Pennsylvania National Bank, which resulted in a formal agreement on July 16, 1968, in which Esterline agreed to pay $4,250,000. in cash and 50,000 shares fo Esterline restricted stock for the 100% Of MS&R stock then held by Rhoades and two other persons to whom he had sold some shares.
 
 
 8
 Rochez Bros. brought this action under section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b) and Rule 10b-5 of the Securities and Exchange Commission with pendent jurisdiction fraud counts under Pennsylvania law.[3] The case was tried to the court, which entered judgment of January 22, 1973, in favor of Rochez and against Rhoades in the amount of $402,000., with interest from September 16, 1967.[4] The district court on the same day also entered a separate order dismissing the action as to MS&R, the corporate defendant.
 
 I. LIABILITY OF RHOADES
 
 9
 Defendant Rhoades contests the district court's decision on the ground that plaintiff failed to demonstrate the following elements necessary to establish liability under section 10(b) of the Securities Exchange Act and Rule 10b-5 of the Securities and Exchange Commission.
 
 A. Scienter
 
 10
 The question of whether proof of actual knowledge or willful or reckless disregard of the truth is necessary to establish liability under Rule 10b-5 is an unsettled area of the law. The circuits are divided on this question. Some have adopted a negligence standard. See City National Bank v. Vanderboom, 422 F.2d 221, 229-230 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); Myzel v. Fields, 386 F.2d 718, 734-735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Stevens v. Vowell, 343 F.2d 374, 379-380 (10th Cir. 1965); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962); Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961).[5] However, recently the Second Circuit, sitting en banc, held that scienter was a necessary element in a case involving non-disclosure of material facts. Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973). This court has never been faced squarely with this issue, and we need not resolve it in this case, since the Lanza decision makes clear that to the extent scienter is required, that requirement is satisfied in a non-disclosure case where, as here, the defendant had knowledge of the undisclosed information.[6] See also A. Bromberg, Securities Law: Fraud, Vol. 2, P8.4 (521) at p. 204.131, and P8.4(525) at pp. 204.137-44 (1971). Defendant seems to argue that the scienter test requires further proof that the non-disclosure was willful and not merely negligent, suggesting that in light of the time pressure placed on him to agree to plaintiff's terms, his nondisclosure does not constitute fraud. Defendant does not cite any cases to support this claim,[7] and there is considerable authority against interpreting a scienter requirement as equivalent to a showing of intent to defraud. See A. Bromberg, supra, P8.4(544) at pp. 204.177-81 and cases cited therein. Defendant was under a duty to disclose all material facts to plaintiff, and his failure to do so when he had actual knowledge of those facts satisfies any scienter requirement.[8]
 
 B. Materiality
 
 11
 The test of the materiality of undisclosed or misrepresented facts is basically an objective one-- i.e., whether 'a reasonable man would attach importance (to them) in determining his choice of action in the transaction in question.' List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). See also Myzel v. Fields, 386 F.2d 718, 734 (8th Cir. 1967), cert. dennied,390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Under this test there is little doubt that information concerning negotiations by one owner of 50% Of the stock of a business with potential purchasers is material, for a reasonable man who owned the other 50% Of the stock would surely attach importance to that information in deciding whether to sell out to his co-owner. Defendant's arguments on this point do not directly dispute this reasoning, but rather contest the district court's finding of those facts held to be material. We must, therefore, review the record to determine if the district court's finding that defendant was engaged in negotiations with Simmonds and Carus for the sale of MS&R, and that these negotiations had reached a stage where their existence and contents were material, is clearly erroneous. See F.R.Civ.P. 52(a).
 
 
 12
 There is ample evidence that Rhoades hired Royce to find a purchaser of MS&R and that this fact was concealed from Rochez.[9] There was equally adequate proof that Royce helped to arrange the visit of English to MS&R, that Simmonds was interested in the prospect of acquiring MS&R and that Rhoades knew it. Defendant contends that his discussions with English concerned only the sale of MS&R products to Simmonds and not acquisition of MS&R by Simmonds. However, there is ample support in English's testimony that acquisition discussions began during that visit.[10] Defendant also contends that his contacts with Simmonds in September 1967 during his trip to its plant near Hartford and the return trip to Pittsburgh had nothing to do with acquisition of MS&R. Again, there is sufficient evidence to support the district court's skepticism toward this contention and its finding that the purpose of the trip was to continue acquisition discussions begun in May.[11] The district court also rejected as improbable the claim by defendant that the visits of the Carus brothers to the MS&R plant were merely to look at the computer system employed by MS&R.[12] Defendant argues that even if his version of these visits is not believed, it cannot support the opposite conclusion-- that acquisition negotiations with Carus did occur. However, the district court's finding as to these visits does not depend solely upon its disbelief of Rhoades' testimony, but also derives from inferences it could properly make from other evidence in the record.[13] Finally, even if we were to accept defendant's protestations that he rejected all advances made by Simmonds and Carus concerning the purchase of MS&R, it is undisputed that they displayed a strong interest in such an acquisition, and that interest would certainly be a factor affecting the decision of a reasonable man in Rochez's position with respect to the transaction between him and Rhoades. We therefore hold that the district court's findings supporting its conclusion that there were material facts that defendant failed to disclose are not clearly erroneous.
 
 C. Due Care
 
 13
 The cases generally hold that before an insider may claim reliance on a material misrepresentation or nondisclosure, he must fulfill a duty of due care in seeking to ascertain for himself the facts relevant to a transaction. See, e.g., Financial Industrial Fund, Inc. v. McDonnell Douglas Corp., 474 F.2d 514 (10th Cir. 1973); Clement A. Evans & Co. v. McAlpine,434 F.2d 100 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); City National Bank v. Vanderboom, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). However, the cases also hold that a plaintiff cannot fail in his duty of due care if he lacked any opportunity to detect the fraud. See, e.g., Johns Hopkins University v. Hutton, 422 F.2d 1124 (4th Cir. 1970), on remand, 326 F.Supp. 250 (D.Md.1971); City National Bank v. Vanderboom, supra; Lehigh Valley Trust Company v. Central National Bank, 409 F.2d 989 (5th Cir. 1969). The nondisclosed facts here were in Rhoades' personal knowledge or private files and were not available to Rochez. There is no evidence that any corporate books, records, or minutes available to Rochez contained information with respect to the employment of Royce or the negotiations with Simonds or Carus. Thus, Rochez's status as an insider, his financial expertise, and his business acumen are all irrelevant, for he had no access to the critical information or any opportunity to discover the non-disclosed facts. We therefore conclude from the record that Rochez adequately fulfilled his duty of due care.
 
 D. Reliance
 
 14
 [9,10] Recovery under Rule 10b-5 is sometimes said to require a showing that the party seeking damages actually relied on the misrepresentation or omission of material facts. See, e.g., List v. Fashion Park, Inc., supra at 462 of 340 F.2d. Thus, while the objective test of materiality (see p. 408, supra) provides the basis for the defendant's duty to disclose, the reliance requirement provides the causal link between the non-disclosure and the loss suffered. However, proof of reliance is not required in all cases under Rule 10b-5. The Supreme Court his recently held:
 
 
 15
 'Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384 (90 S.Ct. 616, 621, 24 L.Ed.2d 593) (1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 (89 S.Ct. 1454, 22 L.Ed.2d 756) (1969); 6 L. Loss, Securities Regulation 3876-3880 (1966 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud-- SEC Rule 10b-5, 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. Chasins v. Smith, Barney & Co., 438 F.2d (1167) at 1172 ((2d Cir.)).'
 
 
 16
 Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).[14] We do not read this decision to say that the question of reliance vel non may not be considered at all in a non-disclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plantiff's decision as to the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied. See Prosser, Law of Torts, 103 (3d ed. 1964). However, in light of the Supreme Court's holding in Affiliated Ute, the burden of proof rests squarely upon defendant to establish the 'non-reliance' of plaintiff.
 
 
 17
 Defendant stresses a number of facts which he claims show that Rochez would have proceeded to reach the same buy-sell agreement with defendant as he did on September 16, 1967, even if he had known of the negotiations with Simmonds and Carus. First, from earlier negotiations to sell MS&R authorized by the Board of Directors, Rochez knew that Rhoades had valued a 50% Interest in MS&R to a possible outside purchaser at $1.75 million, and this was at a time prior to the Babcock & Wilcox contract that proved so lucrative to MS&R. Rochez considered that valuation ludicrously high. Second, Rochez initiated the deal on September 11, 1967, and gave Rhoades only until September 15, 1967, to agree to it and to put up $50,000., which would be forfeited if the closing did not take place. Third, when Rochez set the price at which Rochez Bros. Would sell its MS&R stock to Rhoades, he atated that he did not care where Rhoades got the money and that he assumed that Rhoades had outside investors waiting in the wings. These facts demonstrate that Rochez did not share Rhoades' sanguine estimation of the worth of MS&R stock, was most anxious to press forward with the deal, and was unconcerned with the source of the money that was to pay for the shares of MS&R stock held by Rochez Bros. However, they do not compel the conclusion that Rochez would have been indifferent to the amount of money that Simmonds or Carus was willing to pay. Even if it is true, as Rhoades contends, that as of September 16, when the firm commitment was signed, he had not yet received any specific offer from either Simmonds or Carus,[15] the record indicates that negotiations had progressed far enough that on offer of a price by one of the prospective purchasers was to be expected shortly.[16] On the basis of the evidence before it, the district court could properly have concluded that if Rochez had been apprised of the undisclosed facts, he would not have plunged ahead with the buy-sell agreement with Rhoades on the same terms without first finding out how much Simmonds or Carus was prepared to pay, and that these estimates would have influenced his willingness to sell to Rhoades at the price he had originally asked.
 
 E. Conclusion
 
 18
 On the basis of the foregoing analysis, we affirm the decision of the district court as to the liability of defendant Rhoades under Rule 10b-5.
 
 II. THE MEASURE OF DAMAGES
 
 19
 In Affiliated Ute Citizens v. United States, supra, at 155, 92 S.Ct. at 1473 the Supremen Court held that the correct measure of damages under 28 of the Securities Exchange Act is the difference between the fair value of what the seller received for his stock and what he would have received had there been no fraudulent conduct, 'except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.' The Court cited as authority for this latter measure of damages the decision in Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), where the First Circuit held:
 
 
 20
 'On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.'
 
 
 21
 The court in Janigan recognized that there are limits to this principle,[17] but found that those limits were not reached where no extraordinary gains in the company's own special efforts subsequent to the purchase occurred.[18]
 
 
 22
 The district court recognized that the measure of damages here is governed by Janigan but held that it would be unjust to award Rochez the full value of the amount realized by Rhoades in the sale of MS&R stock to Esterline, since the increase in the value of MS&R was the result partly of Rhoades' aggressive and enterprising management ability and partly of the termination of the divided control. The district court, therefore, used its estimate of the value of the Simmonds offer as the basis to determine plaintiff's damages. The problem with this result is that the facts of this case do not exceed the limits that the First Circuit placed on its damages principle in Janigan. Even if Rhoades' aggressive management of MS&R could properly be characterized as constituting a special effort outside the regular duties for which he was paid, there is nothing in the record to indicate any such special efforts took place after the signing of the firm commitment on September 16, 1967.[19] Moreover, the ending of the divided control which the district court stressed as the cause of the increase in the value of MS&R subsequent to September 16 is surely not a valid reason for limiting plaintiff's recovery, since it was by his fraudulent non-disclosure that Rhoades obtained undivided control of MS&R. We do not believe that this is the type of personal effort that the court in Janigan intended to except from its rule of damages. Thus, the district court erred when it refused to compute Rochez's damages on the basis of the value Rhoades received for the MS&R stock from Esterline. The proper measure of damages is the difference between the value 50% Of MS&R stock on the basis of the Esterline purchase price and the amount Rochez received from Rhoades for his share of MS&R.
 
 
 23
 We can well understand the concern expressed by the dissenting opinion regarding the amount of damages. However, after careful consideration of the language of the Supreme Court in Ute, we have concluded that we are bound by the clear rule of damages enunciated in that case. Even assuming that there may be exceptions to the rule of damages set forth in Ute, as explicated in Janigan, we do not believe that this is a proper case for such an exception.
 
 
 24
 III. DISMISSAL AS TO CORPORATE DEFENDANT MS&R
 
 
 25
 The district court entered an order after the trial was completed dismissing the action as to MS&R, which order contained this language:
 
 
 26
 '. . . the Court being of the opinion that any wrongdoing of defendant Rhoades was on his own account as a stockholder and individual and not in the course or scope of his employment by the said corporate defendant MS&R Inc., or for the account or benefit of said corporate defendant or attributable in any wise to said corporate defendant, said corporate defendant being instead the passive object of such transfers of its stock as were effected through the activities (wrongful or otherwise) of said defendant Rhoades . . ..'
 
 
 27
 Plaintiff argues that this order of dismissal was erroneous, since the facts on the record establish liability of MS&R under two theories: first, that there was sufficient 'participation' by MS&R to make the corporate defendant an aider, abettor, or conspirator with Rhoades; second, that MS&R was a controlling person within the meaning of 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78t(a), which makes liable a 'person' who 'controls' one who violates a rule.[20]
 
 
 28
 It is unnecessary for this court to decide this question at this time, for the district court failed to make findings to support its dismissal as required by Rules 41(b) and 52(a) of the Federal Rules of Civil Procedure. The opinion and judgment against defendant Rhoades, entered the same day as the order dismissing the action against corporate defendant MS&R, does not satisfy the provisions of Rule 52(a), for the findings of fact contained therein do not relate to and cannot support the conclusion stated by the district court in its order of dismissal.
 
 
 29
 We therefore will vacate the January 22, 1973 order dismissing the action as to MS&R (Document 72, W.D.Pa., Civil No. 68-1048) and remand so that the district court can make the necessary findings of fact. That part of the January 22, 1973, district court judgment (Document 73, W.D.Pa., Civil No. 68-1048) providing for damages of $402,000. will be vacated and the case will be remanded to the district court for proceedings not inconsistent with this opinion.
 
 OPINION SUR PETITION FOR REHEARING
 
 30
 VAN DUSEN, Circuit Judge.
 
 
 31
 In his petition for rehearing, defendant Rhoades contends that this court's increase in the amount of damages awarded plaintiff Rochez Bros. by the district court was unwarranted.
 
 
 32
 First, Rhoades argues that this court misapplied the damage rules of Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), in such a way as to make the result penal. Rhoades points out that neither Affiliated Ute nor Janigan considered what effect a plaintiff's knowledge of the non-disclosed facts, subsequent to the transaction out of which the 10b-5 violation arose, would have on the time as of which damages are to be measured. According to the record in this case, in February 1968 Rochez received a telephone call from Royce, who informed him that negotiations had been going on with Simmonds, that on offer had been received from Simmonds in the form of stock, and that in Royce's view, the offer was in excess of $2 million, although the exact amount was not disclosed (N.T. 600-01). Rhoades maintains that while the receipt of such information did not impose any duty on plaintiff to institute suit against him, the 'high water mark' of plaintiff's damages should be fixed at the date he received this information, i.e. February 1968. The consequence of this limitation would be to establish the Simmonds offer as the measure for plaintiff's damages, since negotiations for the sale of MS&R to Esterline (the eventual purchaser) did not begin until mid-April 1968.
 
 
 33
 In support of this limitation on the Janigan 'benefit of the bargain' rule of damages, Rhoades relies on the decision in Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). In that case, defendants' purchases of stock from plaintiffs in August 1959 were found to have been procured through affirmative misrepresentations of the financial condition of the company and under non-disclosure of material incidents in the corporate operations. Plaintiffs first received information indicating that they might have been defrauded sometime in the fall of 1959,[21] but did not renounce their sales to defendants by filing their suits until August 16, 1962. Because this delay of three years was found to be unreasonable and because of the fluctuating character and value of the stocks in question, the Fourth Circuit reversed the trial court and held that plaintiffs were not entitled to the equitable remedy of rescission. Turning to the question of damages, the court applied the Janigan rule, but limited its computation of damages to a period which ended with the first stock split and public offering of March 8, 1961, at which time the trial court found plaintiffs knew, or sould have known, of the fraud. To allow damages to be calculated on the basis of the value of plaintiffs' prior interest at the time of the second stock split, on March 19, 1962, as plaintiffs contended, would permit, according to the court, a recovery grossly disproportionate to the harm done and hence constitute a penalty not intended by the Securities Act.
 
 
 34
 In evaluating the relevance of the Baumel decision to the instant case, it is important to bear in mind that the limitation on the measure of damages there, was, in the words of the Baumel opinion, 'because of the volatile nature of first-offering stock prices, and in the circumstances of this case . . ..' 412 F.2d at 576. It is clear from the opinion that the circumstances of overwhelming importance in that case was the unreasonably long delay of plaintiffs in initiating their 10b-5 actions-- three years from the time they first had reason to suspect fraud and 18 months from the time they had reason to know for sure that they had in fact been duped-- during which the value of their prior interest increased dramatically. Thus, the purpose of the limitation was to prevent a defrauded party from delaying unreasonably the commencement of his suit in order to reap an excessive recovery because of the increased value of speculative property that he had fraudulently been induced to sell. Such a limitation is consistent with the reasoning of the First Circuit in Janigan that 'it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them,' 344 F.2d at 786, since in a case like Baumel the defrauded party is no longer himself completely free of wrongdoing and is thus not entitled to windfalls subsequent to his learning of the fraud.[22]
 
 
 35
 However, we must note that subsequent to Baumel the Supreme Court in Ute approved of the Janigan rule of damages in terms that are unequivocal and unqualified. 406 U.S. at 155, 92 S.Ct. 1456, quoted at p. 1473 of the December 21, 1973, opinion of the court, supra. Nothing in that language suggests the sort of limitation applied by the Fourth Circuit in Baumel.
 
 
 36
 Furthermore, on its facts, the instant case is clearly distinguishable from Baumel. Although Rhoades was able to bargain the price of MS&R up considerably from February 1968 (when Rhoades first learned of the Simmonds offer) to July 16, 1968 (when the agreement to sell to Esterline was signed), the MS&R stock was not of the same highly volatile nature as was the stock in Baumel. More importantly, unlike the plaintiffs in Baumel who waited for three years, Rochez brought this action (on September 11, 1968) within a reasonable time (approximately six months) after first learning that he might have been defrauded. There is no evidence of any intent on the part of Rochez to delay commencing this suit in order to gain windfall profits from the sale of MS&R. On the contrary, Rochez told Royce at the time of their conversation 'that he would be perfectly delighted to get together with Mr. Rhoades and me (Royce) and discuss an adjustment and a compromise of the respective interests, and this would leave it up to Mr. Rhoades to make an adjustment and compromise whether he wanted to go through with the (Simmonds) deal or not. If he wanted to ge through with the deal, fine. If he didn't that was fine, too.' (N.T. 601).[23] In the absence of an unreasonable delay, there is no basis, in the Baumel decision, to limit the award of damages by the value of the Simmonds offer in February 1968; to do so might enable a fraudulent seller who anticipated being sued to limit his potential liability merely by informing or having someone else inform the defrauded party of facts suggesting that he was defrauded.
 
 
 37
 Finally, even if we were to apply Baumel's limitation on the Janigan rule to this case, the measure of damages would remain just as we held it to be in the December 21, 1973, opinion of the court, supra. The information which Rochez received from Royce in February 1968 was uncertain and incomplete. Rochez could not be sure that Royce was telling the truth about the Simmonds for Rhoades. The exact amount of the Simmonds offer was not revealed, and in any case that offer was made in the course of continuing negotiations which had not yet been and never were successfully completed. Also, no mention was made of the negotiations with Carus. Thus, at that time Rochez's position was analogous to that of the plaintiffs in Baumel when they first learned that they might have been defrauded. However, the court in Baumel set as the time limit for assessing the value of plaintiffs' prior interest not the point at which they first realized that they might have been defrauded (fall of 1959), but the date of the public offering of the company's stock (March 1961), when they learned or should have learned for certain that their sale of stock had been fraudulently induced. In this case, Rochez could not be certain that he had been defrauded until he met with Royce in August 1968, which was after the sale of MS&R to Esterline. During that meeting, Rochez saw for the first time the agreement whereby Rhoades employed Royce to aid him in finding a buyer for MS&R and Royce's daily diary containing a number of entries relating to telephone conversations that he had with Rhoades concerning the negotiations with Simmonds and/or Carus. (N.T. 101-102). Furthermore, there is no evidence in the record to suggest that constructive knowledge could be imputed to Rochez of these matters, and the district court made no such finding here. Thus, if any time limitation should be imposed in assessing damages in this case, it would be August 1968. Such a 'limitation' would mean that Rochez could recover no more than the difference between the price at which he sold his share of 50% Share in MS&R at the price at which Rhoades sold to Esterline in July 1968. That, of course, is precisely the measure of damages that this court has ruled to be appropriate in this case.
 
 
 38
 Second, Rhoades also argues that there can be no recovery under Section 10(b) of the Act in this case since the trial court found that at the time of the transaction Rochez Bros. received the fair market value for the MS& R stock it sold to Rhoades, and hence plaintiff suffered no economic harm. Assuming, without deciding, that the district court's finding on this point is not clearly erroneous,[24] we nevertheless hold that Rhoades' fraudulent conduct did cause Rochez financial injury. The district court found, and this court has affirmed, that if Rochez Bros. had known of the facts which Rhoades failed to disclose to it, it would not have sold its stock in MS&R for $598,000. in November 1967, since it would have had reason to believe, as subsequent events confirmed, that a greater gain would have been realized by retention of the stock. See Baumel v. Rosen, 412 F.2d at 573.[25] Rhoades cites no cases holding that a defrauded seller may not recover unless he received for his stock a price that was less than its market value at the time that such seller sold it, and neither Janigan nor Ute was predicated upon that circumstance. The reasoning of the First Circuit in Janigan that 'it is simple equity that a wrongdoer should disgorge his fraudulent enrichment,' 344 F.2d at 786, would apply with equal force whether or not the defrauded seller received less than market value for his stock. It is true that in Ute the Supreme Court held that a defrauded seller's damages are the amount of defendant's profits in those cases where the defendant received more than the seller's 'actual loss.' 406 U.S. at 155, 92 S.Ct. 1456. However, the clear intent of the Ute rule of damages, read in its entirety and in light of Janigan, is to give a defrauded seller the benefit of whichever measure of damages provides the greater recovery: either the difference between the sale price of the stock in the fraudulent transaction and its fair market value at that time or the amount of the fraudulent buyer's profit on resale. In light of the Supreme Court's adoption of this liberal approach to damages, the words 'actual loss' should not be read to create a requirement that the defrauded seller should sell his stock for less than its fair market value at the time of the fraudulent transaction. Indeed, to do so would create the anomalous result that a defrauded seller in the above circumstance would receive no recovery, while one who had received even a small amount less than the market value for his stock would recover not the difference between what he received and the fair market value but the full amount of defendant's profit on resale.
 
 
 39
 Rhoades' reliance on the conclusion of the district court that the increased value of MS&R was attributable to his own special efforts and that, therefore, Rochez was not entitled to recover the amount of Rhoades' profits has been considered and rejected in the December 21, 1973, opinion, supra at p. 412.
 
 
 40
 A majority of the above panel votes to deny the petition for rehearing and joins in this opinion. Circuit Judge HASTLE has no objection to this opinion, but adheres to the views expressed in his December 21, 1973, opinion dissenting in part.
 
 
 41
 HASTLE, Circuit Judge (dissenting in part).
 
 
 42
 I agree that the district court correctly decided the questions of liability. My dissent is limited to the matter of damages. On this issue, all circumstances considered, it seems to me that the district court measured and limited its award of damages in a way that was equitable and proper.
 
 
 43
 Accordingly, I would affirm judgment in its entirety.
 
 
 
 [1]
 '78j. Manipulative and deceptive devices
 'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 . . . .be
 '(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'
 
 
 [2]
 'Rule 10b-5. Employment of Manipulative and Deceptive Devices
 'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 '(1) to employ any device, scheme, or artifice to defraud,
 '(2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 '(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'
 2A The agreement covered the sale by Rochez Bros. to Rhoades of stock in another company as well as the stock of MS&R. Apparently $598,000. represents that portion of the total amount of $650,000., mentioned in the agreement, allocable to such MS&R stock, since the district court used the figure of $598,000. in computing damages.
 
 
 [3]
 The named defendants were Rhoades and MS&R; two other individual defendants who were officers of MS&R were dismissed during the trial and their dismissal is not involved in this appeal
 
 
 [4]
 The district court held defendant Rhoades liable because of its finding that he failed to disclose material information (with respect to the Simmonds and Carus dealings) before September 16, 1967. It therefore found it unnecessary to decide whether the nondisclosure of material facts between September 16, 1967 (the date of the agreement) and November 13, 1967 (the date of the closing) could give rise to liability
 
 
 [5]
 For a thorough analysis and criticism of these cases, see the concurring and dissenting opinion of Adams, J., in Kohn v. American Metal Climax, Inc., 458 F.2d 255, 279-288 (3d Cir. 1972)
 
 
 [6]
 The court in Lanza stated that 'a plaintiff claiming a violation of Rule 10b-5 who cannot prove that the defendant had actual knowledge of any misrepresentations and omissions must establish, in order to succeed in his action, that the defendnat's failure to discover the misrepresentations and omissions amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge.' 479 F.2d at 1305. The court therefore refused to hold liable a corporation president who had no knowledge of the material facts that other directors had failed to disclose in the course of certain transactions; his mere negligence in not ascertaining those facts was held not to satisfy the scienter requirement
 
 
 [7]
 According to a leading scholar, 'no 10b-5 decision squarely requires 'intent to defraud,' or clearly equivalent phreases.' A. Bromberg, supra, P8.4(543) at p. 204.175
 
 
 [8]
 In any case, there appears to be substantial evidence in the record to support an inference that Rhoades' failure to disclose material facts to Rochez was deliberate. See note 9 infra
 
 
 [9]
 Defendant argues that his hiring of Royce cannot be characterized as a concealment from or a surprise to Rochez since the lattter specifically turned down Royce's services after having been introduced to him by Rhoades. This argument overlooks several important facts. Royce testified that 'when he (Rhades) took me by to meet Rochez, he asked me not to tell them what we were talking about' (N.T. 585). In a memorandum the day before Royce's visit, Rhoades directed that MS&R mail would thenceforth be opened only by MS&R employees and not by Rochez Bros. employees (who shared the same office) (PX-25). Furthermore, Rhoades admitted that he never told anyone from Rochez Bros. about the letter employment agreement with Royce (N.T. 1658). Thus, even if Rochez declined to hire Royce as a finder (as Rhoades testified), it does not relieve Rhoades from the duty of revealing that he had in fact hired Royce in opposition to Rochez's wishes, as found by the district court
 In its January 22, 1973, order dismissing the action as to corporate defendant MS&R, the district court concluded that any wrongdoing of defendnat Rhoades was done on his own account as a stockholder and individual and not in the course or scope of his employment by MS&R. This conclusion implies that the district court believed that Royce was not hired by MS&R for corporate purposes, but by Rhoades solely for personal matters. However, the court made no specific findings that Royce was or was not employed by MS&R. See p. 20 infra. While this issue is important with respect to the question of the liability of MS&R, it is irrelevant as to Rhoades' liability, since the district court finding of the hiring of Royce is not clearly erroneous, and whether for private or corporate purposes it was a material fact that Rhoades failed to disclose to Rochez.
 
 
 [10]
 Ebglish testified that on this visit to MS&R, the general nature of his conversation with Rhoades was: 'Review of the plant, discussion generally of the business, the business potential, Simmonds, its potential. And general body chemistry, meeting to determine whether Charles Rhoades and Simmonds Precision, represented by myself, could get along' (N.T. 1151). English also stated that his next contact with Rhoades in September 1967 was 'in furtherance of the negotiations begun in May' (N.T. 1154)
 
 
 [11]
 Rhoades argues that the testimony of Hager (N.T. 1342-44), who was the MS&R production vice-president and who accompanied him on this trip, demonstrates that its purpose was to consult with Simmonds on some production problems they were having. However, although Hager testified that he and Rhoades were asked to advise on a production problem, he also stated that he could not say what the purpose of the trip was (N.T. 1306), although he assumed from 'the prior month's general activity in our plant, that there possibly could be an acquisition interest from the Simmonds' standpoint.' (N.T. 1307). Furthermore, Rhoades' telephone call from the Connecticut airport to his attorney in Pittsburgh to find out if Rochez had finally agreed on a buy-sell arrangement, the presence of Mr. Coombs, a lawyer for Simmonds, at the plant and at the subsequent dinner, and Mr. Geoffrey Simmonds' visit to the MS&R plant after flying back to Pittsburgh in the Simmonds Company plane with Rhoades and Hager, all suggest that the purpose of the visit was to discuss a possible acquisition of MS&R by Simmonds
 
 
 [12]
 The court found that the MS&R plant used a standard IBM computer. The credibility which it chose to give, or not give, to the testimony of Rhoades, and his witness Mr. Monaco, is a matter within the discretion of the district court as trier of fact
 
 
 [13]
 Having found that the purpose of the visit of the Carus brothers was not to look at the MS&R computer, the district court could properly assume that the visit had some purpose and could infer that it was to discuss the acquisition of MS&R by Carus from the following facts. Royce testified that he arranged for the Carus brothers to visit Rhoades and that he later talked to Rhoades and advised him that he would not have to pay Royce a commission if a deal was completed with Carus (N.T. 590-91, 593). Hager testified that he recalled meeting a number of persons or showing a number of persons around the MS&R plant, probably in the second quarter of 1967, who were 'connected with an organization that had some interest in acquiring MS&R' and among them were persons from Carus Chemical and Simmonds (N.T. 796)
 
 
 [14]
 In addition, we have held that in a suit by shareholders suing because of allegedly misleading statements in a proxy report, 'to the extent a reliance factor is required, in the present context it is encompassed by the finding that the misrepresentation was materal.' Kohn v. American Metal Climax, Inc., supra at 269 of 458 F.2d
 
 
 [15]
 The September 29, 1967, letter from Geoffrey Simmonds that Rhoades testified contained the first offer of a purchase price begins by stating that it is to confirm the understanding between Simmonds and Rhoades as to the former's acquisition of MS&R. Rhoades testified on cross-examination that this was a reference to a conversation of the previous day in which Simmonds told Rhoades that he had something of interest that he was putting in the mail. This explanation is dubious since the detailed terms laid out in the letter suggest that there had been prior discussions between Simmonds and Rhoades as to those terms. Furthermore, a letter to Rhoades from Coombs, Simmonds' attorney, dated September 15, enclosed copies of the Simmonds insurance, pension, and disability plans, with a request that Rhoades send to Simmonds corresponding material of MS&R. Such minor details related to integration of two companies are not normally discussed until negotiations have been conducted with respect to the more substantive matters, such as purchase price
 
 
 [16]
 The September 15 letter from Coombs to Rhoades, in particular, indicates that the negotiations had progressed well beyond the point of initial contacts and had reached a rather advanced stage, from which Rochez, had he known of them, might reasonably have concluded that an offer of a purchase price was imminent. This conclusion is supported by the fact that, even according to Rhoades' testimony, the first offer of a purchase price came only 13 days after the signing of the firm commitment on September 16, 1967
 
 
 [17]
 'If an artist acquired paints by fraud and used them in producing a valuable portrait we would not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale.' Janigan v. Taylor, supra at 787
 
 
 [18]
 The court in Janigan pointed out that there was no evidence that defendant did anything different or worked aby harder following the acquisition than he had before, that the company's improvement was attributable to factors independent of his personal efforts, and that he received a salary for the performance of what were his regular duties. Janigan v. Taylor, supra at 787
 
 
 [19]
 Indeed, the only factor alluded to in the district court's opinion affecting the value of MS&R for which Rhoades was responsible was the lucrative Babcock & Wilcox contract which was entered into earlier in 1967
 
 
 [20]
 Section 20(a) of the Act has been applied to Rule 10b-5 violations in SEC v. First Securities Company of Chicago, 463 F.2d 981 (7th Cir.), cert. denied sub nom. McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); and Myzel v. Fields, supra. In First Securities the court held the company liable for the Rule 10b-5 violation of its president under both theories advanced by plaintiff here. The court held that as an employee, the president is 'controlled' by the company within the meaning of 20(a) and that in order for a controlling person to escape liability by showing that it acted in good faith, it must show that some precautionary measures were taken to prevent its employee's violation. The court also reaffirmed its holding in Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135, 144 (7th Cir. 1969), that liability predicated on aiding and abetting may be founded on less than actual knowledge and participation in the activity proscribed by section 10 of the Act and Rule 10b-5
 
 
 [21]
 One of the plaintiffs admitted that shortly after the sale he believed 'he had been taken,' while the other plaintiff testified that at Thanksgiving or Christmas of 1959 he had been told that the company 'had plans to go public and that the stock was worth a lot of money more than I had received for it.' 412 F.2d at 574
 
 
 [22]
 This interpretation of the purpose of the limitation of damages in Baumel does not conflict with the court's fixing, as the cut-off point for evaluating plaintiffs' prior interest, the time they learned or should have learned of the fraud. It might be argued that it would be more consistent with the goal of discouraging unreasonable delays in commencing suits to set as the time limit the point at which the delay became unreasonable. However, such a rule would burden the courts with the necessity of determining when that point occurred, and such determination would tend to be somewhat arbitrary. Moreover, even if the courts were to establish a definite length of time as a standard for deciding this unreasonable delay issue, such a rule would encourage delays within the time span determined to be reasonable
 
 
 [23]
 It is irrelevant that in January 1968, Rochez received an offer from Rhoades throught an intermediary to sell all of the stock of MS&R back to him at the same price which Rhoades had paid and that this offer was rejected. Nothing in the record indicates that as of January 1968 Rochez was aware of the negotiations between Rhoades and Simmonds and Rhoades and Carus
 
 
 [24]
 The district court's finding that the $598,000. that Rochez received for his 50% Share in MS&R was the fair market value seems inconsistent with the fact that at the time the agreement of sale was signed on September 16, 1967, Rhoades was already engaged in negotiations with Simmonds that resulted in an offer on September 29, 1967, to buy MS&R for roughly $2 million. As one leading scholar has noted:
 'There are, of course, difficulties in determining value of securities sold upon material misrepresentation or omission. They are greatest for closely held securities. If there is prompt resale, it provides obvious evidence of 'true' value.' A. Bromberg, Securities Law: Fraud, Vol. 3, P9.1 at p. 228 (1973).
 
 
 [25]
 In Baumel the Fourth Circuit affirmed a finding of the district court that plaintiffs had suffered sufficient economic loss to recover, despite the fact that they sold their stock at a price returning them a profit of 900%. The court's reasoning was the same as ours here, since, but for the fraudulent misrepresentation and non-disclosure, plaintiffs would have retained their stock and ultimately would have realized an even greater gain